MILLER, Judge pro tem.
Commercial Credit Corporation seeks via ordinary process to recover $599.50 together with interest and attorney’s fees as the balance due on a note executed by Wallace Carrier, and to have its chattel mortgage recognized on a 1955 Ford automobile. Carrier denied owing any sum to the plaintiff and specifically alleged that Dutch O’Neal Motors, Inc. through its agents altered the agreement whereby Carrier agreed to purchase the car and fraudulently filled in the note and sale & chattel mortgage (which forms had been signed by Carrier before any of the blanks had been completed) to show a total financed price of $1,991.50 when he only agreed to pay a total financed price of $1,496.83. In his answer to the suit, Carrier further alleged that Commercial Credit Corporation was “a party to the entire fraudulent transaction and is subject to all of the defenses available to the defendant against Dutch O’Neal Motors, Inc. * * Coupled with the answer, Wallace Carrier filed a reconventional demand against Commercial Credit Corporation and a third party action, under the provisions of LSA-R.S. 13 :3381 et seq., against Dutch O’Neal Motors Inc., seeking to be recognized as the owner of the automobile free from any liens, and further seeking $2,250.00 damages from Commercial Credit Corporation and Dutch O’Neal Motors, Inc., for the alleged slander and libel of his honesty, integrity, and business and social standing, for inconvenience and humiliation and for reasonable attorney’s fees.
Third party defendant Dutch O’Neal Motors, Inc. filed an exception to the third party petition which exception reads, so far as is here relevant, as follows:
“Now into Court through their undersigned counsel comes Dutch O’Neal Motors, Inc., a Louisiana corporation domiciled in the Parish of Orleans, State of Louisiana, made third party defendant in the above numbered and captioned cause, appearing solely for the purpose of these exceptions and excepts to the defendant’s third party petition on the following grounds, namely:
“1.
“That this Honorable Court lacks jurisdiction over the person of Dutch O’Neal Motors, Inc.
“2.
“The third party petition does not state a cause or right of action against Dutch O’Neal Motors, Inc.”
These exceptions were argued in liminie and overruled by the trial court. Dutch O’Neal Motors, Inc., filed an answer “with full reservation of all of its rights under the exceptions previously filed herein and overruled by the Court, * * * ” and participated in the trial without further objection. After hearing the merits, the trial court held that Commercial Credit Corporation was a holder in due course since it received the note in its present state without any knowledge of any defects and was therefore entitled to judgment as prayed for; that subsequent to the trial court’s decision overruling the exception to the jurisdiction ratione personae filed by Dutch O’Neal Motors, Inc., the case of Cameron v. Reserve Ins. Co., 237 La. 433, 111 So.2d 336 was decided and held “that the court in which a third party petition has been filed must have jurisdiction over the person of the defendant in the third party action in order to render judgment.” Therefore third party defendant’s exception to the jurisdiction was at that time sustained, but Carrier’s right to proceed against *258 Dutch O’Neal Motors, Inc., in a court of proper jurisdiction was reserved.
Wallace Carrier perfected this devolutive appeal urging “that the judgment of the trial court be reversed insofar as it sustained the exception of jurisdiction ratione personae filed by Dutch O’Neal Motors, Inc.; that the judgment of the trial court in favor of Commercial Credit Corporation be vacated; and that the case be remanded to the trial court in order to have a complete judgment rendered on the merits.”
The uncontradicted testimony introduced on behalf of Commercial Credit Corporation shows that when the note was received, it was complete and regular upon its face; that Commercial Credit Corporation became the holder, of the note before the due date; that Commercial Credit Corporation took the note in good faith and for value; and that at the time the note was negotiated to Commercial Credit Corporation, the corporation had no notice of any infirmity in the instrument or defect, in the title of Dutch O’Neal Motors, Inc. Thus all of the conditions set forth in the provisions of LSA-R.S. 7:52 have been met and Commercial Credit Corporation is therefore a holder in due course of the note executed by Wallace Carrier. The trial court’s judgment so holding is eminently correct. Cases in point are First National Bank of Lafayette v. The Tiger Shark, D.C., 173 F.Supp. 379, and First National Bank of Lafayette v. The King Fish, D.C., 173 F.Supp. 367.
The original decision by the trial court overruling the exception of jurisdiction ratione personae filed by Dutch O’Neal Motors, Inc., was correct. The exception to the jurisdiction ratione personae was coupled with an exception of no cause and no right of action. In filing the exception in this manner, the third party defendant waived any right he might have had to question the jurisdiction of the Twenty-First Judicial District Court. As was held in the case of George W. Garig Transfer v. Harris, 226 La. 117, 75 So.2d 28, 31:
“ * * * the exception of want of jurisdiction ratione personae, to be valid, must be presented in liminie and alone, and ‘an appearance to the suit, except for the purpose of objecting to the jurisdiction, or to the process or citation, subjects defendant to the jurisdiction of the court.’ ”
See also Hungerford v. Hungerford, 240 La. 24, 121 So.2d 226 and Mitchell v. Gulf States Finance Corporation, 226 La. 1008, 78 So.2d 3. Support for this holding is also found in the case of Cameron v. Reserve Insurance Company, 237 La. 433, 111 So.2d 336, 343 which was relied on by the appellee and wherein it is stated that:
“A defendant may, therefore, file several dilatory exceptions at the same time, but in order for an exception to the jurisdiction ratione personae to be effective such exception must be filed in the alternative with full reservation of rights.”
In this case the exceptor did not plead the exceptions of no cause or right of action in the alternative to the exception to the jurisdiction ratione personae with full reservation of his rights to that exception. Therefore, the exception to the jurisdiction must be overruled.
AVe do not find it necessary to remand the case for the reason that the third party defendant, Dutch O’Neal Motors, Inc., actively participated in the trial and rested its case on the merits at the conclusion of the trial. Should we remand the case, it would be for the sole purpose of having the trial court review the same record which is before us at this time so that the trial court could decide the merits of the third party action by Carrier against Dutch O’Neal Motors, Inc. This decision would in turn be subject to review on both the law and the evidence by this court. Since we have the entire record before us for review at this time and since all of the parties fully participated in the trial on the merits and there is no suggestion that any additional evidence might be produced, *259 we have concluded that it is proper for us to decide the merits of the third party action brought by Carrier against Dutch O’Neal Motors, Inc.
Although Commercial Credit Corporation has been held to be a holder in due course and, under LSA-R.S. 7:14 is entitled to recover the amount shown to be due on the face of the note, this does not prevent Carrier from recovering from' Dutch O’Neal Motors, Inc. the amount which Carrier may show was over and above the sum which he authorized Dutch O’Neal Motors, Inc. to write on the face of the note and sale & chattel mortgage.
In considering this question, it is well settled that fraud is never presumed and that clear and convincing proof must be adduced to establish it. The burden is on Mr. Carrier and in order for him to recover, he must sustain that burden with clear and convincing proof. LSA-C.C. Article 1848 provides that:
“Art. 1848. Fraud, like every other allegation, must be proved by him who alleges it, but it may be proved by simple presumptions or by legal presumptions, as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence.”
Although the salesman representing Dutch O’Neal Motors, Inc., testified that the note and sale & chattel mortgage were completely filled out before each was executed by Carrier, we are of the opinion that the note and sale & chattel mortgage were both signed in blank by Carrier. Carrier expressly so testified and the salesman’s testimony under cross-examination on the point was:
“Q. In other words, the typed up— the final chattel mortgage with the typing on it and the note was not signed in the presence of witnesses and a Notary Public, or witnesses and one of the witnesses appearing before a Notary Public authenticating it?
“A. I would say this, it would have to be signed at the office, I know that he didn’t sign any blank papers when I was in Amite, that night all he signed was the purchase order. Because I know he would have had to sign them with a pen and none of us had a pen, that is why we used a pencil.
“Q. The original note being sued upon was signed in pencil, do you know that?
“A. I don’t remember why we would have used that.”
No effort was made to explain away this admission by the salesman. The note and sale & chattel mortgage are in evidence and were signed by Carrier in pencil, whereas all of the other blanks were filled in by typewriter, excepting the signature blanks which, other than Carrier’s, were signed with pen and ink.
LSA-R.S. 7:14 sets forth the law applicable to this set of facts as follows:
“Where the instrument is wanting in any material particular, the person in possession thereof has a prima facie authority to complete it by filling up the blanks therein. And a signature on a blank paper delivered by the person making the signature in order that the paper may be converted into a negotiable instrument operates as a prima facie authority to fill up as such for any amount. In order, however, that any such instrument when completed may be enforced against any person who became a party thereto prior to its completion, it must be filled up strictly in accordance with the authority given and within a reasonable time. But if any such instrument, after completion, is negotiated to a holder in due course, it is valid and effectual for all purposes in his hands, and he may enforce it as if it had been filled up strictly in accordance with the authority given and within a reasonable time.” (emphasis added)
*260 We must consider what amount Dutch O’Neal Motors, Inc. had authority to enter in the blanks of the note and sale & chattel mortgage. There are two versions as to what amount the employees of Dutch O’Neal Motors, Inc. had authority to enter in the blanks. In this connection, the version of the salesman has already been disregarded, for his testimony that the note was signed after all blanks were completed was completely discredited. However, he does refer to other exhibits in his testimony as substantiating his contention that the financed price was $1,991.50. Carrier’s version of the negotiations which both parties agree were completed at Carrier’s home in Amite on the night of March 1, 1955, was that the 1955 Ford was sold to him for a net trade of “around $1,000.00.” Carrier understood that the price of the car was “between $1,900.00 and $2,000.00” and that he was getting a trade in of $875.-00 for his 1950 GMC pickup truck which all agree was in excellent condition. Carrier knew that the finance charges were to be added, but accepted the salesman’s representation that those could not be computed on that date and testified:
“ * * * he said you haven’t much to finance, around $1,000.00, * *
Carrier testified that the first notice he received as to the amount of the mortgage was when he received his license plate and the pink slip which showed that his title to the car was subject to a first mortgage in favor of Commercial Credit Corporation dated March 1, 1955 in the amount of $1,496.83. Carrier further testified that the other notice which he received as to the full amount of the mortgage was the coupon book showing the payments due to Commercial Credit Corporation. This coupon book as read by Carrier showed that he had 25 payments at $58.00 each, which totaled $1,450.00. Concerning this sum, Carrier testified:
“I told the madam, I said he said the carrying charges wouldn’t be very much on that little and I said they must be pretty high — $1,400.00 and something, he run it from $1,000.00 up to fourteen hundred and some odd dollars.”
In evaluating Carrier's understanding of the transactions it is to be noted that his' education was limited. Fie testified that “I just got to the fourth grade.”
It was the salesman’s version of the negotiations of March 1, 1955 that the car was being sold for a total selling price of $2,271.83, and that the trade-in allowance for Carrier’s pickup truck was $775.00, leaving a balance to be financed of $1,496.-83. He agreed that they were unable to calculate the finance charges, and for that reason did not know the exact amount to be financed. However, he was certain that Carrier agreed to make 23 monthly payments at $58.00 each, with one additional balloon note for the balance. The salesman admitted that they did not discuss the fact that this note was what is commonly termed a balloon note, but maintains that it was well understood that this last payment would be much larger than the others. The balloon installment was to be calculated in New Orleans and made a part of the buyer’s order before the new car would be delivered to Carrier. It was the salesman’s position that the balloon installment figure of $657.50 was made a part of the “Retail Buyer’s Order” before delivery of the new car was made. To confirm this the salesman points to the “Retail Buyer’s Order” which shows some initials which the salesman testified were Carrier’s. It was therefore contended that Carrier specifically agreed to pay 23 installments at $58.00 each and one at $657.50. The salesman admits that there were no calculations on the buyer’s order which would indicate that these installments totaled $1,991.50.
To summarize: Carrier contends that he owed for the car and finance charges but $1,496.83, while Dutch O’Neal Motors, Inc. contends that Carrier owed $1,991.50. It was stipulated that Carrier made 24 payments of $58.00 each, and that his 25th payment tendered in the same amount was refused.
*261 To determine what authority was given to Dutch O’Neal Motors, Inc. to fill in the blanks on both the note and sale & chattel mortgage, we have the testimony of four witnesses for Carrier and one for Dutch O’Neal Motors, Inc. We are most impressed with the exhibits and will first discuss each one.
The bill of sale which confirms the salesman’s version of the transaction was never received by Mr. Carrier. Although there is some testimony that the bill of sale is usually mailed to the purchaser, there is also testimony by the salesman that the bill of sale is usually placed in the glove compartment. As against this testimony, we have the positive testimony of Mr. and Mrs. Carrier that they never received the bill of sale, and must hold that the bill of sale was never shown or delivered to them. In passing it is noted that the bill of sale also states that the amount financed is $1,496.83. Although the bill of sale goes on to state that this amount is financed “thru Commercial Credit Corp. 2121 Banks St., N. O., La. 23 notes @ $58.-00 & 1 @ 657.50”, at no point is it stated that the total amount for the car plus finance charges comes to $1,991.50.
The next exhibit in evidence is the title certificate, which is a photostatic copy of the application for a license plate (a copy of which is sometimes herein referred to as the pink slip) a copy of which was sent to Mr. Carrier along with his license plate. Mr. Carrier admits that he received this pink slip. When he received it he noted that the mortgage was in the sum of $1,496.83. This application for a title and license plate was prepared by Dutch O’Neal Motors, Inc., and certainly was calculated to confirm to Carrier the fact that the note and sale & chattel mortgage were in the sum of $1,496.83.
Also in evidence is the coupon book which Carrier received from Commercial Credit Corporation to show the monthly payments due by him, together with one of the coupons. The record makes it clear that the one coupon which is in evidence is an exact duplicate of each of the remaining twenty-four which were prepared by Commercial Credit Corporation for Mr. Carrier to identify his monthly payments. Each of these twenty-five coupons clearly stated that the monthly payments were $58.00 each. There was nothing on the coupons to show that the total debt was $1,991.50. There was a square printed in the upper left side of the coupon (on the side opposite from the place where the coupon states “$58.00 amount due each month”) which reads “Amt. final payment (if different) $ ”, which space is more blank than filled in. The very bottom of the figures 657.50 is shown in this square. However, more of these figures are outside than within the square. Furthermore, there is nothing on the face of the coupon which specifically states that the final payment is different. On the contrary, while each coupon states that there were 24 payments and that the “amount due each month” is $58.00, the coupon book contained twenty-five such coupons. While it was a coincidence that these twenty-five coupons would total $1,450.00, this fact certainly would confirm to one who had only passed to the fourth grade in school, that the total financed cost of his car was in line with his understanding.
The remaining exhibit before us in the record is the “Retail Buyer’s Order”. This instrument was filled out in pencil on the night of March 1, 1955. There are numerous erasures and irrelevant computations. In addition there are certain pencil notations by at least two parties other than the salesman or Carrier. Further there are some notations placed on the exhibit with a ball point pen, and still others with a fountain pen. Where the “Retail Buyer’s Order” contains space for the “used car allowance” the pencil figures show $775.00 in three places. In two of these places, there is an obvious erasure which clearly shows that the original figure written was $875.00.
This “Retail Buyer’s Order” clearly states at the end of the line which reads *262 “BALANCE FINANCED THRU” the sum of $1,496.83, which is the amount Carrier contends that he owes. To the left of this total there are some figures which have obviously been written over some illegible erasures, which appear to us to be: “23 x '$58 & 18657.50”. Most of this quoted information appears in a circle along with the initials “WC”. The salesman expressly testified he witnessed Carrier initial this in New Orleans on March 2, 1955 when Carrier took delivery of the car, but Carrier expressly denies that he initialed this at any time. To follow the salesman’s logic as expressed in his testimony concerning the signing of the note in New Orleans (that he was sure the note was signed in New Orleans, because they didn’t have a pen when they were in Amite), we note that the initials on the “Retail Buyer’s Order” were also inserted in pencil. Whatever interpretation is made of these figures, it is obvious that these figures were placed by an entirely different type of handwriting than the salesman or Carrier. The salesman’s testimony justifying his certainty that the figures which he understands to state “1 @ 657.50” were inserted on the “Retail Buyer’s Order” and initialed by Carrier in New Orleans before he was allowed to take delivery of his new Ford, was that a circle was put around Carrier’s initials and the figures which he contends were “23 x $58 & 1 @ 657.50”. As noted before the figures which appear to us to be $18657.50” were obviously written by someone other than the salesman or Carrier, and the last two figures of this amount are completely out of the circle and a part of the third to last figure is outside the circle. As we appreciate these circumstances, they go to show that the figures 657.50 were obviously added after Mr. Carrier initialed (if indeed the initials were his own) the computations showing the amount of his payments, .rather than to show that he approved the adding of a balloon note in the sum of $657.50.
Considering our evaluation of the exhibits as expressed hereinabove, we find it unnecessary to discuss the other differences in the testimony of the parties.
To summarize, we find that the note and sale & chattel mortgage were signed in blank; that there is no evidence suggesting that Carrier was ever informed that the total amount which Dutch O’Neal Motors, Inc. had authority to place on this note was anything other than $1,-496.83. The most convincing evidence offered by Dutch O’Neal Motors, Inc. is the retail buyer’s order which showed that Carrier’s payments were to be “23 x $58 & 1 @ 657.50” as contended by Dutch O’Neal or as we view it “23 x $58 & 18657.50”. But even when these figures were carried out to the final line on the “Retail Buyer’s Order” the total listed was $1,496.83. As we have noted herein-above, we conclude that the record shows that the figures “18657.50” were not inserted before Carrier initialed the order if in fact he did initial the order. We find that Carrier carried the burden of showing that their agreement was that the total financed charge would be as is shown in the final column of the “Retail Buyer’s Order,” and as is shown on the pink slip and Title Certificate, to be the sum of $1,496.83. Therefore we find that the agents of Dutch O’Neal Motors, Inc. raised the note and sale & chattel mortgage which had been signed in blank, from the sum which Carrier agreed to pay i. e. $1,496.83, to the sum of $1,991.50. Therefore, Carrier is entitled to judgment against Dutch O’Neal Motors, Inc., in the sum of $494.67, together with all costs of these proceedings.
We must now consider Carrier’s claim for damages for “slander and libel of his honesty and integrity, and business and social standing, for inconvenience and humiliation”. We find no evidence in the record tending to sustain this contention. We have not been cited to any law and we *263 know of none, which authorizes the assessment of attorney’s fees as damages under these circumstances. However, Wallace Carrier is entitled to recover from Dutch O’Neal Motors, Inc. the interest and attorney’s fees which Commercial Credit Corporation recovered from him in this suit which Commercial Credit Corporation filed against Carrier, and which is also before this court.
For these reasons, the trial court’s judgment in favor of Commercial Credit Corporation is affirmed, and the remainder of the judgment is reversed and it is hereby ordered, adjudged and decreed that there be judgment herein in favor of Wallace Carrier and against Dutch O’Neal Motors, Inc. in the full sum of $494.67 together with all of the interest, attorney’s fees and court costs awarded to Commercial Credit Corporation in its suit against Wallace Carrier, together with all costs of court.
Affirmed in part and reversed in part and rendered.