E. D. KRANZUSH, special administrator of the Estate of Dorothy Gerlikovski, Deceased, Plaintiff-Appellant-Petitioner,

v.

BADGER STATE MUTUAL CASUALTY COMPANY, a Wisconsin insurance corporation, Defendant-Respondent.

Supreme Court

*No. 80–504. Argued March 30, 1981.—Decided June 30, 1981.*

(Also reported in 307 N.W.2d 256.)

For the petitioner there were briefs by *J. Robert Kaftan* and *Kaftan, Kaftan, Kaftan, Van Egeren, Ostrow & Gilson, S.C.,* of Green Bay, and oral argument by *J. Robert Kaftan.*

For the respondent there was a brief by *Kurt H. Frauen, W. Ted Tornehl* and *Borgelt, Powell, Peterson & Frauen, S.C.,* of Milwaukee, and oral argument by *Kurt H. Frauen.*

WILLIAM G. CALLOW, J.   The sole issue presented on this review is whether a tort victim can bring an action against the tortfeasor's insurer for bad faith in failing to settle the victim's claim. Both the trial court, in granting the defendant-insurer's motion to dismiss, and the court of appeals, in affirming the dismissal, concluded that no such cause of action exists in this state. We affirm.

Because this matter is before us on a motion to dismiss for failure to state a claim upon which relief can be granted, the only  facts are those stated in the complaint, which for purposes of this review must be taken as admitted. *Scarpaci v. Milwaukee County,* 96 Wis.2d 663, 669, 292 N.W.2d 816 (1980) ; *Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 24, 288 N.W.2d 95 (1980) ; *General Split Corp. v. P & V Atlas Corp.,* 91 Wis.2d 119, 122–23, 280 N.W.2d 765 (1979) ; *Morgan v. Pennsylvania General Ins. Co.,* 87 Wis.2d 723, 731, 275 N.W.2d 660 (1979) ; *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 683, 271 N.W.2d 368 (1978). As pleaded, the facts indicate that on November 10, 1974, Dorothy Gerlikovski was injured when the automobile in which she was a passenger struck a utility pole in a motel parking lot. The car was being driven by Dorothy's husband. Dorothy commenced an action in the circuit court for Brown county against her husband and his liability insurer, Badger State Mutual

Casualty Company (Badger), the respondent herein, alleging negligence and seeking damages for her injuries. This action is still pending in the circuit court and is not involved in this review.

Following Dorothy's death the administrator of her estate commenced the instant action against Badger. The material allegations of the complaint are as follows:

"8. That the injuries which she sustained resulting from the accident consisted of injuries to her left shoulder, elbow, knee, right leg, forehead and neck, and that at the time of the injury the plaintiff's decedent had recently had a radical mastectomy, which was performed on August 14, 1974, and that she was in a weakened condition as a result of such mastectomy; and that at the time of the accident the area of the breast upon which the mastectomy was performed was further injured and damaged.

"9. That after the commencement of the action, the defendants, by their attorneys, through repeated requests for medical reports and hospital reports and through the filing of interrogatories, which were answered, were fully aware of the circumstances relating to the plaintiff's decedent's injuries and of the progress of the cancer which gave rise to the mastectomy and were fully apprised of the fact that the mortality of the plaintiff's decedent as a result of the aggravation of the cancer area in the left breast was very limited.

"10. That the defendants at all times had available to them all medical information needed to supply them with information relating to the plaintiff's decedent's injuries, and the defendants knew that the plaintiff's decedent was going to die within a short period of time from the cancer; and that the defendants used every means available to them to prolong the litigation so that the plaintiff's decedent either would be unable to assert herself while in good health or that she would die before the matter came to trial.

"11. That the action of the defendant herein was intentional and taken with the knowledge of the plaintiff's decedent's physical and emotional condition and the

protraction of the litigation was adversely affected by the bad faith conduct of the defendant.

"12. That the defendant herein acted arbitrarily, wilfully and in bad faith and with malice and outrageously and for the purpose of saving the company money.

"13. That these acts of constant delay, and even an attempt to delay twelve days before the death of the plaintiff's decedent, were intentional, malicious and outrageous and were meant to take advantage of Dorothy Gerlikovski's physical and mental condition. That these tactics of harrassment [sic] and delay were meant to cause the plaintiff's decedent to give up her claim and to minimize the amount of the defendant's liability. That such acts were in bad faith and with intent and effect of causing emotional distress.

"14. That during the protraction of the litigation, the defendant had numerous opportunities to settle the litigation on a fair and reasonable basis but that at all times while the plaintiff's decedent was capable of making decisions it arbitrarily, intentionally and in bad faith refused to consider the settlement of an obvious claim for damages made by the plaintiff's decedent, which failure to settle caused her grief and emotional distress."

On July 2, 1979, Badger moved to dismiss the complaint for failure to state a claim upon which relief can be granted. In a memorandum decision dated February 7, 1980, the circuit court for Brown county, the Hon. WILLIAM J. DUFFY presiding, granted Badger's motion, concluding that an insurer owes no duty to third-party claimants relative to the settlement of claims.[1] On appeal the court of appeals, in an unpublished opinion, concluded likewise and affirmed. *Kranzush v. Badger Casualty Co.*, 98 Wis.2d 748, 297 N.W.2d 515 (Ct. App. 1980).

---

[1] Before granting the defendant's motion to dismiss, Judge Duffy analyzed the complaint to see whether it stated a claim for relief for intentional infliction of emotional distress and concluded that it did not. His decision allowed the plaintiff ten days in which to plead again, but the plaintiff did not do so. We assume for purposes of this review that the plaintiff has abandoned this theory of recovery.

## I.

Under our case law the notion that an insurance company may be required to respond in extracontractual damages as a result of certain tortious conduct in the settlement of claims or the payment of benefits has evolved into three separate theories of bad-faith recovery. In this case the petitioner urges us to recognize a fourth. Before addressing the particulars of this new theory of bad-faith recovery, we will briefly review the development of the first three.

Where an injured party makes a claim against the tortfeasor's insurer, we have held that the insurer has an obligation to the insured to exercise good faith in the settlement of the claim. This obligation, which arises by virtue of the contractual relationship of the insurer and the insured, reflects the fact that in the standard liability insurance contract the insured surrenders completely the right to control the settlement or litigation of the victim's claim within the limits of the insurer's exposure. The threat to the insured is obvious: If the insurer fails to settle a third-party claim within the limits of the policy and chooses instead to litigate the matter, the insured will be exposed to that portion of any judgment which exceeds the policy limits. Thus in *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 231 N.W. 257, 235 N.W. 413 (1931), we affirmed a plaintiff-insured's recovery of an excess judgment against his insurer and held that in the processing of claims against an insured an insurer has a duty to make a diligent investigation of the facts and a duty to inform the insured of the possibility of a recovery in excess of the policy limits. A third duty, a duty to keep the insured timely and adequately informed of all settlement offers received from the claimant, was added by the court in *Baker v. Northwestern National Casualty Co.*, 22 Wis.2d 77, 125 N.W.2d

370 (1963). The essence of this aspect of bad faith is explicated in *Alt v. American Family Mutual Ins. Co.,* 71 Wis.2d 340, 348, 237 N.W.2d 706 (1976), where we stated:

"It is obvious, then, that what we speak of when referring to bad faith is the breach of a known fiduciary duty. This carries with it the duty to act on behalf of the insured and to exercise the same standard of care that the insurance company would exercise were it exercising ordinary diligence in respect to its own business. Since that is the accepted standard, an insurance company, in which is vested the exclusive control of the management of a case, breaches its duty when it has the opportunity to settle an excess liability case within policy limits and it fails to do so."

*See also: Johnson v. American Family Mutual Ins. Co.,* 93 Wis.2d 633, 287 N.W.2d 729 (1980) ; *Howard v. State Farm Mutual Auto. L. Ins. Co.,* 70 Wis.2d 985, 236 N.W. 2d 643 (1975) ; *Howard v. State Farm Mutual Automobile Ins. Co.,* 60 Wis.2d 224, 208 N.W.2d 442 (1973) ; *Nichols v. United States Fidelity & Guaranty Co.,* 37 Wis.2d 238, 155 N.W.2d 104 (1967) ; *Baker v. Northwestern National Casualty Co.,* 26 Wis.2d 306, 132 N.W. 2d 493 (1965) ; *Maroney v. Allstate Ins. Co.,* 12 Wis.2d 197, 107 N.W.2d 261 (1961) ; *Berk v. Milwaukee Automobile Ins. Co.,* 245 Wis. 597, 15 N.W.2d 834 (1944) ; *Lanferman v. Maryland Casualty Co.,* 222 Wis. 406, 267 N.W. 300 (1936).

A second basis for a bad-faith claim may arise from an insurer's handling of an insured's claim under a casualty, life, health, or accident policy. This type of claim is exemplified by *Anderson v. Continental Ins. Co., supra,* in which we held that an insurer's unreasonable failure to pay its insured's smoke damage claim was an actionable tort. Reiterating the fiduciary relationship between the insurer and the insured first articulated in *Hilker,* we adopted the following statement as the law of this state:

" 'It is manifest that a common legal principle under-lies all of the foregoing decisions; namely, that in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is immanent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' " 85 Wis. 2d at 689, quoting *Gruenberg v. Aetna Insurance Co.,* 9 Cal. 3d 566, 575, 108 Cal. Rptr. 480, 510 P.2d 1032 (1973).

We also declared that "the tort of bad faith is not a tortious breach of contract. It is a separate in-tentional wrong, which results from a breach of duty imposed as a consequence of the relationship established by contract." 85 Wis.2d at 687. Most recently, in *Davis v. Allstate Ins. Co.,* 101 Wis.2d 1, 303 N.W.2d 596 (1981), we applied the *Anderson* holding to affirm a jury's award of compensatory and punitive damages to an insured whose insurer exercised bad faith in its handling of the insured's fire loss claim.

The third situation in which we have recognized a claim against an insurer for bad faith is in the handling of a worker's claim for benefits under a worker's com-pensation policy. In *Coleman v. American Universal Ins. Co.,* 86 Wis.2d 615, 273 N.W.2d 220 (1979), the plaintiff, an injured worker who received compensation benefits under the policy, sued the insurer and its ad-justers for bad faith in three times stopping the compen-sation payments in spite of their knowledge of the va-lidity of his claim. Beginning with the observation that the *Anderson* rationale was applicable to third-party claims, we held that the plaintiff's bad-faith suit was not barred by the exclusivity provision of the Worker's Compensation Act.

To these instances where we have recognized an in-surer's potential tort liability for bad faith in the handling

of claims the petitioner seeks to add a fourth: Liability of the insurer to a third-party claimant for the insurer's failure to settle the claim where the liability of the insured is reasonably clear. Not surprisingly, the petitioner relies heavily upon *Coleman* and *Anderson* for the rationale upon which this liability should be premised. It is our task first to determine whether any of the three kinds of bad-faith cases heretofore discussed would support the kind of claim being suggested.

The first inquiry, and perhaps the one most easily answered, is whether such a claim could be viewed as an extension of the excess liability cases typified by *Alt*. We think not. In the first place, the instant case does not involve an excess judgment since the principal negligence suit has yet to reach judgment. But more important, it is clear that this excess liability bad-faith tort is a vehicle to enforce the insurer's duty to be mindful of the insured's interests when settling third-party claims. A settlement within policy limits is, as a practical matter, of no interest to the insured, since the insured has paid his premium and is shielded to the extent of the policy limits. But as the insurer weighs the merits of settlement within policy limits against the risks of litigation (a decision which the insured has relinquished to the insurer), the insured's potential excess liability hangs in the outcome. In *Alt* we concluded: "All prior Wisconsin cases indicate that an insurance company has more than a passive role—that, in some circumstances at least, it has an affirmative duty to seize whatever reasonable opportunity may present itself to protect its insured from excess liability." 71 Wis.2d at 350. Just as clearly, our cases indicate that the insurer's duties of diligent investigation, notice of excess liability potential, and communication of settlement offers run to the insured, and the cause of action upon their breach belongs to the insured. In every one of our excess liability bad-faith cases

the plaintiff is either the insured or the assignee of the insured's claim.

The inappropriateness of the excess judgment cases as a basis for the petitioner's cause of action stems from a fundamental mismatch of the interests sought to be served by the respective rights of action. The excess judgment cases balance the insurer's right to control the settlement process (and protect its own interests) against the insured's right to be protected from liability for which he is not covered. These are concerns to which the third-party claimant is a stranger. In fact, whereas the relationship of the insurer and the insured which gives rise to the excess judgment type lawsuit is one of trust and cooperation, the relationship of the third-party claimant is adversarial.

The second inquiry deals with whether the petitioner's claim can be based upon the "first-party" type of bad-faith suit recognized in *Anderson*. Again, we think not. The heart of the tort recognized in *Anderson* is the fiduciary relationship between the insurer and the insured and the insurer's breach of the duty of good faith and fair dealing implicit in every contract. Where a person contracts with an insurance company for coverage in case of particular losses, the insured has a right to expect to be treated fairly and to have legitimate claims paid promptly. Where these expectations are not met because of the insurer's tortious conduct, the insured can recover damages. As before, there is a basic difference between the rights sought to be protected in an *Anderson* suit and those in the petitioner's claim. The insured's right to be treated fairly (and his recourse to the courts if he is not) is rooted in the contract of insurance to which he and the insurer are parties. The third-party claimant has not contracted for insurance benefits and is not in a contractual relationship, much less a relationship of trust, with the insurer. Absent this relationship, any

right of a third-party claimant to be treated fairly in the settlement of a claim is clearly not actionable under *Anderson*.

The third inquiry is whether *Coleman* offers a basis for the petitioner's claim. While on the surface this would appear to be a much closer question, once again we conclude it does not. *Coleman* recognized as "boilerplate law in Wisconsin that the rationale underlying statutory worker's compensation is that workers accept smaller recoveries than those potentially available at common law in return for coverage of all work-related injuries regardless of fault." 86 Wis.2d at 621. A recalcitrant insurer subverts this goal by depriving the injured worker of the certain and swift recovery to which he is entitled and for which he has given up his right to pursue a larger recovery in a civil action. In contrast, a third-party claimant tort victim, such as the petitioner's decedent in this case, is not the object of a sweeping statutory scheme designed to promote the compensation of injuries in a routine, largely nonadversarial manner. It is still the obligation of the tort victim to establish the fault of the tortfeasor, and it is still the prerogative of the alleged tortfeasor to defend himself in court.

Even this cursory overview suggests the significantly greater impact of an insurer's bad faith in a worker's compensation case than in a tort case. For the tort victim, the failure to settle with the tortfeasor is but the first skirmish; the principal battle is yet to come. But where an injured worker cannot obtain compensation benefits, his alternatives are far more limited. His ability to bring an action against the insurer for bad faith under the principles set forth in *Anderson* is some assurance that his exclusive remedy will not be denied through the intentional wrongdoings of the insurer.

Furthermore, owing to the design of the worker's compensation laws, the injured employee and the insurance carrier occupy relative positions which are analogous to the insurer-insured relationship at the heart of the *Anderson* tort. Where a work-related injury occurs, liability is imposed upon the employer (sec. 102.03(1), Stats.), the statutory recovery is the employee's sole remedy (sec. 102.03(2)), and the employer or the insurer must pay (secs. 102.22 and 102.31). Under these legislatively imposed conditions, it is reasonable for the employee to expect fair dealing from the insurer, and it is not unreasonable to impose upon the insurer that duty. *See: Hayes v. Aetna Fire Underwriters*, 609 P.2d 257 (Mont. 1980); and *Gibson v. National Ben Franklin Insurance Co.*, 387 A.2d 220 (Me 1978).

The petitioner argues that the third-party claimant in an ordinary tort case does enjoy a special relationship with respect to a tortfeasor's insurer. Citing legislative prohibitions against certain policy exclusions, sec. 632.34 (2) and (3), Stats. 1977, certain kinds of mandated coverages, sec. 632.34(6), 1977, prohibitions on cancellation, sec. 632.35, and the availability of direct action, secs. 632.24 and 632.22, the petitioner asserts that these provisions were intended to broaden coverage and facilitate recovery for injured claimants. Even assuming that in enacting these provisions the legislature had the interests of third-party claimants in mind, it is obvious that these statutes fall far short of creating the no-fault compensatory scheme embodied in the worker's compensation statutes. There is no statutory exclusive remedy with its attendant immunity; both the tortfeasor and the insurer are susceptible to civil suit. There is no general requirement that a person carry liability insurance in the first instance. The obligation of a tortfeasor to pay damages for his torts is of common law, not statutory origin. The claimant is not locked into a legislatively

driven bargain whereby his recovery, though smaller, is not contingent upon his success in a lawsuit.

Because we conclude that the special conditions which attend the relationship of an injured employee and the worker's compensation carrier are not present where the tort victim asserts a claim against a tortfeasor's insurer under ordinary tort principles, we do not view *Coleman* as requiring the same result. We are mindful of our language in that case, however, where we said: "It is apparent that the rationale of *Anderson* is applicable not only to the claim of a first-party insured against its insurance company, but is also applicable when the case involves a third-party claim against an insurer." 86 Wis.2d at 620. While we now construe that language to be a recognition of the foregoing considerations unique to the worker's compensation situation, the words themselves are unnecessarily broad. To erase any doubt, we declare that this language is not to be taken to confer a general right of action upon third-party claimant tort victims against the tortfeasor's insurer under the rule in *Anderson*.

Having concluded that there is nothing in our previous bad-faith cases which requires the recognition of the claim the petitioner seeks to assert, we now consider whether we should recognize this new right of action nevertheless.

The plight of the third-party claimant in a bad-faith situation has been given far less attention by courts and commentators than has that of the wronged insured. In cases where an insurer's failure to settle within policy limits has resulted in an excess judgment, the claimant is a judgment creditor for the full amount. One commentator explains that in this situation, while an assignment of the insured's bad-faith claim to the claimant-creditor is a common occurrence, there have been some efforts to create in the claimant a means to recover the

excess judgment directly from the insurer where for some reason an assignment is not made. Comment, *Liability Insurers and Third-Party Claimants: The Limits of Duty,* 48 U. Chi. L. Rev. 125, 140 (1981).

Accordingly, rather than seeing the claimant languish as the judgment creditor of an uncollectible debt, or perhaps drive the insured into bankruptcy, courts have permitted the third-party claimant to recover directly against the insured upon a third-party beneficiary theory, *Thompson v. Commercial Union Ins. Co. of New York,* 250 So.2d 259 (Fla. 1971), or by garnishment of the insurer's debt to the insured, *Rutter v. King,* 57 Mich. App. 152, 226 N.W.2d 79 (1974), *Gilley v. Farmer,* 207 Kan. 536, 485 P.2d 1284 (1971), *Shaw v. Botens,* 403 F.2d 150 (3d Cir. 1968). But the overwhelming weight of authority holds that the excess judgment creditor has no action against the insurer. *See, generally,* Annot., 63 A. L. R.3d 677 (1975 and Supp 1980), *Right of Injured Person Recovering Excess Judgment Against Insured to Maintain Action Against Liability Insurer for Wrongful Failure to Settle Claim.* The reasons most often advanced for denying this right of action are that the duty to settle runs to the insured, not the claimant; that the excess judgment does not in fact injure the claimant; and that the claimant is a stranger to the contractual relationship between the insurer and the insured. *Bean v. Allstate Ins. Co.,* 285 Md. 572, 403 A.2d 793, 794–95 (1979). *See also: Page v. Allstate Ins. Co.,* 126 Ariz. 258, 614 P.2d 339 (1980) ; *Winchell v. Aetna Life & Casualty Ins. Co.,* 394 N.E.2d 1114 (Ind. App. 1979).

Considerably less attention has been given the problem with which we deal today—whether the insurer may be liable to the injured claimant for a wrongful failure to settle or negotiate irrespective of the existence of an excess judgment. Such a right of recovery is urged by some, *see, e.g.,* Comment, *Extending the Insurer's Duty*

of *Good Faith and Fair Dealing to Third Parties Under Liability Insurance Policies*, 25 U.C.L.A. L. Rev. 1413 (1978) ; and rejected by others, *see, e.g.,* Comment, *Liability Insurers and Third-Party Claimants: The Limits of Duty*, 48 U. Chi. L. Rev. 125, 140 et seq. (1981) ; Comment, *Royal Globe Insurance Co. v. Superior Court: Right to Direct Suit Against an Insurer by a Third Party Claimant*, 31 Hastings L. Rev. 1161 (1980). The treatment of this issue by other courts is instructive.

In *Linscott v. State Farm Mutual Auto. Ins. Co.*, 368 A.2d 1161 (Me. 1977), the plaintiff entered into negotiations with the insurer of the alleged tortfeasor. After making a settlement offer within policy limits which the insurer rejected, the plaintiff placed the matter in the hands of an out-of-state attorney for further action. Shortly thereafter a settlement was reached, within policy limits and only one thousand dollars less than the plaintiff's original offer. The plaintiff then commenced an action against the insurer, alleging a breach of the insurer's duty "to make whole the person whom [the tortfeasor] has injured." *Id.* at 1163. Treating this as stating a claim for breach of the insurer's duty to negotiate in good faith with the injured party, the court upheld the trial court's dismissal for failure to state a claim upon which relief can be granted. In reaching that conclusion, the court stated:

"The pre-trial negotiations which may be conducted between a tort claimant and a defending insurance company are *adversary* in nature and, hence, will not give rise to a *duty* to bargain in good faith, as claimed by plaintiff. A 'duty of good faith and fair dealing' in the handling of claims runs only to an insurance company's insured, *Bennett v. Slater*, 154 Ind. App. 67, 289 N.E.2d 144 (1972) ; *Seguros Tepeyac, S.A., Compania Mexicana v. Bostrom*, 347 F.2d 168 (5th Cir. 1965) ; it derives from a covenant implicit in the provisions of the insurance contract establishing the insurer as the authorized representative of the insured and is, therefore, without appli-

cation for the benefit of the adversary third party tort claimant. *Murray v. Mossman,* 56 Wash.2d 909, 355 P.2d 985 (1960) ; *Duncan v. Lumbermen's Mutual Casualty Company,* 91 N.H. 349, 23 A.2d 325 (1941). Indeed, that the insurer is the representative of the insured logically imports that the third party tort claimant's status as the adversary of the insured renders him, ipso facto, the adversary of the insured's agent. Thus, prior to the establishment of legal liability, as the tort claimant has no legal right to require the tortfeasor to negotiate or settle, it likewise lacks right to require such action by his representative. *Zahn v. Canadian Indemnity Company,* 57 Cal. App.3d 509, 129 Cal. Rptr. 286 (1976). This is true even if it is the insurer which voluntarily initiates the pre-litigation negotiations with the injured tort claimant. *Francis v. Newton,* 75 Ga. App. 341, 43 S.E.2d 282 (1947)." 368 A.2d at 1163–64.

In *Bowe v. Eaton,* 17 Wash. App. 840, 565 P.2d 826 (1977), the plaintiff was injured such that she was unable to work. The tortfeasor's insurer made an advance offer of 60½ hours of lost wages, and the plaintiff's attorney responded by asking for an additional $4.70. Several weeks later the insurer replied that the original advance for lost wages would no longer be available but that it would entertain final settlement negotiations. The plaintiff then brought an action against the insurer for mental suffering and emotional distress because of the insurer's wrongful failure to advance payment in settlement of her claim. In rejecting this claim, the court stated :

"Its contract [the insurance company's] runs to its insured, Mr. Eaton. That contract imposed an obligation to deal fairly and in good faith on his behalf and in his interest. Regardless of the choice of language, the insurance company must have breached a duty owed to the appellant before it was liable for damages under a tort theory. . . ." (Citations omitted.)
"The respondent insurance company had no contractual obligation to the appellant; it was under no obligation to accept appellant's counteroffer." *Id.* at 829.

In *Scroggins v. Allstate Ins. Co.*, 74 Ill. App.3d 1027, 393 N.E.2d 718 (1979), injured pedestrians brought an action against the driver of the vehicle which struck them and against the driver's insurer, Allstate. The fourth count of the complaint alleged that Allstate breached its duty to negotiate in good faith by failing to accept the plaintiffs' offers to settle at or within the policy limits. The court's discussion of this claim reveals one of the fundamental problems with this type of tort—characterizing the nature of the claimant's injury. In concluding that the plaintiffs had no standing to bring the action, the court relied exclusively on cases dealing with excess judgments where a third party sought to collect the excess directly from the insurer, distilling from them the basic principle that there is no duty owed by the insurer to the claimant to settle the claim. The court continued:

"If these principles apply to bar direct actions against insurers by third parties who have already obtained a judgment in excess of policy limits against the insured, they clearly apply to bar plaintiffs, who are at best potential judgment creditors, from bringing the instant action against Allstate. Indeed, since no excess judgment has yet been rendered against the insured, it remains speculative whether the alleged breach of duty will ever result in the injury that normally gives rise to an action for breach of the duty. (*See generally Wolfberg v. Prudence Mut. Cas. Co.* (1968), 98 Ill. App.2d 190, 240 N.E.2d 176.) Plaintiffs have cited, and we have found, no case in the country permitting a direct action against an insurer by a third party claimant at this stage of litigation, in the absence of statutory or contractual sanction of such an action. Neither have plaintiffs shown that the necessity for such an action outweighs the potential difficulties Allstate has argued are likely to ensue, such as the possibility that insurers will effectively be coerced into settling where their liability has not and may never be established. If plaintiffs do recover an excess judgment against Allstate's insureds, and if they obtain by assignment any claim the insureds might have against Allstate,

perhaps then they may have an action against Allstate. But under the case law discussed above, they clearly have no standing to bring such an action now." 393 N.E.2d at 721.

Clearly the court viewed the injury for which the plaintiffs sought damages as related to the existence of a judgment in excess of policy limits. Yet it is clear that the plaintiffs were seeking damages for their alleged distress and embarrassment caused by the failure of the insurer to settle their claims.

Recently, this issue was presented to the federal district court in Wisconsin. In *Uebelacker v. Horace Mann Ins. Co.*, 500 F. Supp. 180 (E.D. Wis. 1980), the plaintiff-claimant, suing an insurer and its insured in a diversity action, for personal injuries arising from an automobile accident, alleged a cause of action against the insurer for bad faith in failing to negotiate for the settlement of the plaintiff's claim. Granting the insurer's motion to dismiss the claim, Chief Judge Reynolds stated:

"The right of a third party claimant to maintain an action for bad faith against the insurer has, however, been recognized only where the claimant has a vested claim, whether as a result of statutory entitlement, for example under the worker's compensation statutes, or as a result of an unsatisfied judgment against the insured. [Citations omitted.]
". . .
"Plaintiffs in this case have neither a fiduciary relationship with H[orace] M[ann] I[nsurance] C[ompany], nor a judgment against it, nor a statutory claim to recovery from it. Therefore they have no claim against it for bad faith in negotiating or settling the plaintiff's claim." *Id.* at 183–84.

These cases stress a constant theme: an insurer owes no duty to the third-party claimant to settle or to negotiate in good faith. It is clear in the instant case that the injury for which the petitioner seeks compensation is not

related to the existence or even the potential for an excess judgment. Rather, it is for whatever injuries result from an insurer's refusal to settle when the claimant thinks it should, for the distress caused by what the claimant thinks are unfair tactics, and for the deprivation of the funds to which the claimant thinks he is entitled. To declare the existence of a cause of action in favor of the claimant against the insurer for these injuries would be to expose an insurer to liability for failing to satisfy a claim before the fundamental predicate to its duty to do so has been established—the determination of the insured's legal liability. We reiterate the words of the supreme court of Maine, for we believe they well express the extent to which this cause of action would constitute a serious and unprecedented departure from established tort principles:

"Indeed, that the insurer is the representative of the insured logically imports that the third party tort claimant's status as the adversary of the insured renders him, ipso facto, the adversary of the insured's agent. Thus, prior to the establishment of legal liability, as the tort claimant has no legal right to require the tortfeasor to negotiate or settle, it likewise lacks right to require such action by his representative." *Linscott v. State Farm Mutual Auto. Ins. Co.*, 368 A.2d at 1163–64.

We come to the conclusion that the same principles which underlay our recognition of an insured's right to recover from his insurer in both the first party and the excess judgment situations dictate that the claim sought to be asserted here must fail. The insurer's duty of good faith and fair dealing arises from the insurance contract and runs to the insured. No such duty can be implied in favor of the claimant from the contract since the claimant is a stranger to the contract and to the fiduciary relationship it signifies. Nor can a claimant reasonably expect there to be such a duty, inasmuch as the insurer

and the insured are aligned in interest against the claimant. In the absence of any such duty, the third-party claimant cannot assert a claim for failing to settle his claim, and we therefore decline to recognize such a claim for relief under common law tort principles.

## II.

Notwithstanding our conclusion that a third-party claimant cannot state a claim for relief against an insurer for a bad faith refusal to settle under common law principles, we must consider whether such a right of action exists by virtue of statutory or administrative regulatory provisions. Such a private right of action, if it is found in the statutes or the insurance provisions of the Administrative Code, would be in clear derogation of the common law.

"It is an accepted axiom of law in Wisconsin that:

" 'Statutes are not to be construed as changing the common law unless the purpose to effect such change is clearly expressed therein. To have such effect "the language [of the statute] must be clear, unambiguous and peremptory." ' *Wisconsin Bridge & Iron Co. v. Industrial Comm.*, 233 Wis. 467, 474, 290 N.W. 199 (1940)."

*Maxey v. Redevelopment Authority of Racine*, 94 Wis.2d 375, 399, 288 N.W.2d 794 (1980). The legislative intent to change the common law must be expressed "beyond any reasonable doubt." *Grube v. Moths*, 56 Wis.2d 424, 437, 202 N.W.2d 261 (1972) ; *Burke v. Milwaukee & Suburban Transport Corp.*, 39 Wis.2d 682, 690, 159 N.W.2d 700 (1968). And where the question is whether a right of action is to be inferred from a statute, we have observed :

" 'The legislative intent to grant or withhold a private right of action for the violation of a statute, or the failure to perform a statutory duty, is determined primarily from the form or language of the statute. The nature of

the evil sought to be remedied, and the purpose it was intended to accomplish, may also be taken into consideration. In this respect, the general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity, is not subject to a construction establishing a civil liability.' "

*McNeill v. Jacobson*, 55 Wis.2d 254, 258–59, 198 N.W.2d 611 (1972). *See also: Candee v. Egan*, 84 Wis.2d 348, 357, 267 N.W.2d 890 (1978). With these precepts in mind, we turn to the statutes upon which the petitioner relies.

(1) Sec. 632.24, Stats., the direct action statute. This section makes an insurer liable up to policy limits to "the persons entitled to recover against the insured for the death of any person or for injury to persons or property." While it is no doubt true, as the petitioner suggests, that this section is intended to facilitate recovery by injured parties, it is clear from the language of the statute that the liability to which the insurer is exposed is predicated upon the liability of the insured. *See: Ritterbusch v. Sexmith*, 256 Wis. 507, 41 N.W.2d 611 (1950). Under this section the claimant has a right of action against the insurer only to the extent that he has the same right of action against the insured for his negligence. Clearly, it does not provide a right of action against the insurer for a separate, intentional tort committed by the insurer. For these same reasons we do not find an implied right of action in sec. 632.34, defense of noncooperation, or sec. 632.22, providing that insolvency or bankruptcy of the insured will not defeat the right of the claimant to recover against the insurer.

(2) Sec. 601.01(2), Stats. This is one of eleven enumerated purposes of Chapters 600–646 set forth in sec. 601.01.[2] Subsection (2) provides that one purpose of the

---

[2] Sec. 601.01, Stats., provides:
"601.01  **Purposes.**  The purposes of chs. 600 to 646 are:

regulatory statutes is "[t]o ensure that policyholders, claimants and insurers are treated fairly and equitably." It is readily apparent that this subsection does not by express language confer upon any group a right of action. Indeed, it does not by its terms impose a duty, the breach of which could be actionable. No one would argue that fair and equitable treatment of insurers, insureds, and claimants is a desirable goal and one which is worthy of expression in this type of legislation. However, when this stated purpose is viewed with the others in the section, it is clear that the overriding goal of these statutes is to provide the benefits to the general public welfare which flow from a well-regulated insurance industry. In addition, enforcement provisions for specific statutory and rule violations have been provided in sec. 601.64, and the duty of enforcement has been placed with the Commissioner of Insurance. Sec. 601.41(1). Recalling the admonition in *McNeill v. Jacobson, supra,* that a private

"(1) To ensure the solidity of all insurers doing business in this state;

"(2) To ensure that policyholders, claimants and insurers are treated fairly and equitably;

"(3) To ensure that the state has an adequate and healthy insurance market, characterized by competitive conditions and the exercise of initiative;

"(4) To provide for an office that is expert in the field of insurance, and able to enforce chs. 600 to 646;

"(5) To encourage full cooperation of the office with other regulatory bodies, both of this and other states and of the federal government;

"(6) To improve and thereby preserve state regulation of insurance;

"(7) To maintain freedom of contract and freedom of enterprise so far as consistent with the other purposes of the law;

"(8) To encourage self-regulation of the insurance enterprise;

"(9) To encourage loss prevention as an aspect of the operation of the insurance enterprise;

"(10) To keep the public informed on insurance matters; and

"(11) To achieve the other purposes stated in chs. 600 to 646."

cause of action will not be inferred from a statute which generally provides for the public welfare, we are of the opinion that sec. 601.01 is just such a statute, and therefore we do not find it to imply a right of action in favor of the claimant against the insurer.

(3) Wis. Admin. Code Sec. INS 6.11.[3] In this state administrative rules enacted pursuant to statutory rule-

[3] Sec. INS 6.11 of the Wis. Admin. Code provides:

"Ins. 6.11 **Insurance claim settlement practices.** (1) PURPOSE. This rule is to promote the fair and equitable treatment of policyholders, claimants and insurers by defining certain claim adjustment practices which are considered to be unfair methods and practices in the business of insurance. The rule implements and interprets applicable statutes including but not limited to ss. 601.04, 601.01(3)(b), and 645.41(3), Stats.

"(2) SCOPE. This rule applies to the kinds of insurance identified in Ins 6.75, transacted by insurers as defined in s. 600.03(27), Stats., and nonprofit service plans subject to ch. 613, Stats.

"(3) UNFAIR CLAIM SETTLEMENT PRACTICES. (a) Any of the following acts, if committed by any person without just cause and performed with such frequency as to indicate general business practice, shall constitute unfair methods and practices in the business of insurance:

"1. Failure to promptly acknowledge pertinent communications with respect to claims arising under insurance policies.

"2. Failure to initiate and conclude a claims investigation with all reasonable dispatch.

"3. Failure to promptly provide necessary claims forms, instructions and reasonable assistance to insureds and claimants under its insurance policies.

"4. Failure to attempt in good faith to effectuate fair and equitable settlement of claims submitted in which liability has become reasonably clear.

"5. Failure upon request of a claimant, to promptly provide a reasonable explanation of the basis in the policy contract or applicable law for denial of a claim or for the offer of a compromise settlement.

"6. Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages involved.

"7. Failure to affirm or deny coverage of claims within a reasonable time after proof of loss has been completed.

making authority have the force and effect of law. *Law Enforcement Standards Board v. Village of Lyndon Station,* 101 Wis.2d 472, 488, 305 N.W.2d 89 (1981); *Josam Mfg. Co. v. State Board of Health,* 26 Wis.2d 587, 596, 133 N.W.2d 301 (1965). Accordingly, the above-men-

"8. Failure to settle a claim under one portion of the policy coverage in order to influence a settlement under another portion of the policy coverage.

"9. Except as may be otherwise provided in the policy contract, the failure to offer settlement under applicable first party coverage on the basis that responsibility for payment should be assumed by other persons or insurers.

"10. Compelling insureds and claimants to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them.

"11. Refusing payment of claims solely on the basis of the insured's request to do so without making an independent evaluation of the insured's liability based upon all available information.

"12. Failure, where appropriate, to make use of arbitration procedures authorized or permitted under any insurance policy.

"13. Adopting or making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration.

"(b) Any of the following acts committed by any person shall constitute unfair methods and practices in the business of insurance:

"1. Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages involved.

"2. Failure to make provision for adequate claims handling personnel, systems and procedures to effectively service claims in this state incurred under insurance coverage issued or delivered in this state.

"3. Failure to adopt reasonable standards for investigation of claims arising under its insurance policies.

"(4) PROMPT DEFINED. Except where a different period is specified by statute or rule and except for good cause shown, the terms 'prompt' and 'promptly' as used in this rule shall mean responsive action within 10 consecutive days from receipt of a communication concerning a claim.

"(5) PENALTY. The commission of any of the acts listed in subsections (3)(a) or (3)(b)2, or 3 shall subject the person to revo-

tioned precepts governing the presence of implied rights of action in statutes apply to such rules.

Of the various provisions of INS 6.11, the ones most appropriate to this inquiry are 6.11(3)(a)2, 4, 5, and 10. Under 6.11(3)(a)2, it is an unfair practice for an insurer to fail "to initiate and conclude a claims investigation with all reasonable dispatch." Subsection (3)(a)4 makes it an unfair practice for an insurer to fail "to attempt in good faith to effectuate fair and equitable settlement of claims submitted in which liability has become reasonably clear." Under subsection (3)(a)5 it is an unfair practice for an insurer to fail "upon request of a claimant, to promptly provide a reasonable explanation of the basis in the policy contract or applicable law for denial of a claim or for the offer of a compromise settlement." Subsection (3)(a)10 proscribes the practice of "[c]ompelling insureds and claimants to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them." Subsection (5) provides that violations of subsection (3)(a) subject the insurer to possible license revocation as well as the enforcement procedures under sec. 601.64, Stats.

Unlike the general expression of legislative purpose contained in sec. 601.01(2), Stats., which we characterized as intended to benefit the general public welfare more than any particular group of persons, these provisions of the administrative code do reflect a more immediate concern for the treatment of insureds and claimants, so much so that we concede their enactment was for the benefit of those groups. But that a rule is enacted for the benefit of a particular class of persons is not to say it creates a private right of action to assure that

cation of license to transact insurance in this state. Violations of this rule or any order issued thereunder shall subject the person violating the same to s. 601.64, Stats."

those benefits are realized. As we have already stated, the touchstone in the determination of this question is the presence of an expression of legislative intent specifically to create such a right, and the form and language of the rule are the primary indicators of such an expression. *McNeill v. Jacobson, supra.*

The form of INS sec. 6.11 is significant in that, while it sets forth in one subsection a number of examples of proscribed conduct, it provides in a separate subsection the penalties attending their violation. Inasmuch as secs. 601.64 (3) (c) and (4), Stats., already set forth the penalty for the violation of any "insurance statute or rule," the inclusion of INS 6.11 (5) is not necessary to the substance of the rule. Because it is substantively redundant, we are inclined to treat its presence in the rule as indicative of the rule-maker's intent that the statutory enforcement provisions are to be exclusive.

Regarding the language of the rule itself, we are drawn to the terms of INS 6.11 (1), which express the purpose of the rule as "promot[ing] the fair and equitable treatment of policyholders, claimants and insurers *by defining certain claim adjustment practices* which are considered to be unfair methods and practices in the business of insurance." (Emphasis added.) If this rule is treated as defining what the commissioner has determined to be unfair practices, it then becomes the logical complement of secs. 601.01 (3) and 601.64, Stats., by reducing the general concept of unfair conduct to specific examples of business practice which will contravene the purpose of the insurance laws and invoke the enforcement provisions available to the commissioner. Consistent with this reading, we note that the introductory language of INS 6.11 (3) (a) states that the enumerated practices will be considered unfair practices "if committed by any person without just cause and performed with such frequency as to indicate a general business practice." In order for an

insurer's conduct to be classified as an unfair method or practice within the meaning of this rule, the conduct must have two characteristics: it must be done without just cause, and it must be done with such frequency as to be a general business practice. We do not foreclose the possibility that an insurer's treatment of one claimant during the course of the handling of one claim could be considered a business practice, but we have some doubt that it could be considered "general." In any event, we believe this prefatory language, rather than suggesting an intention to create a civil right of action on behalf of individual claimants, underscores the purpose of rule INS 6.11 as an interpretive aid to the application of the commissioner's enforcement powers.

Bearing in mind our initial observations concerning the need for a clear expression of intent to create a private right of action, especially where that right would be in clear derogation of the common law, we conclude that rule INS 6.11 does not contain such an expression. To find in rule INS 6.11 an implied private right of action in favor of a claimant would, we think, be inconsistent with its function as an aid to the interpretation and implementation of the insurance statutes.

Nor are we persuaded to find the existence of a private right of action by the rule in *Royal Globe Ins. Co. v. Superior Court, Etc.*, 153 Cal. Rptr. 842, 592 P.2d 329 (1979). In that case the supreme court of California ruled that a violation of that state's insurance unfair practices laws confers a right of action upon third-party claimants against the violating insurers. Although the particular examples of unfair practices enumerated in the California law are substantially similar to those found in INS 6.11(3)(a), the court's decision was grounded upon the language of a different section of the insurance code which provided: "a cease and desist order issued by the commissioner under the provisions of the act shall

not absolve an insurer from *'civil liability* or criminal penalty *under the laws of this State arising out of the methods, acts or practices found unfair or deceptive.'*" (Emphasis in original.) *Id.* at 332. We can find no analogous provision in our insurance laws to suggest that, in addition to the commissioner's arsenal of enforcement tools, the commission of an unfair practice renders an insurer subject to civil suit by the claimant. Other jurisdictions have reached the same result. *See: Scroggins v. Allstate Ins. Co., supra; Bowe v. Eaton, supra.*

There is but one more step in the completion of our analysis in this case. A complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears to a certainty that no relief can be granted under any set of facts that plaintiff can prove in support of his allegations." *Morgan v. Pennsylvania General Ins. Co.,* 87 Wis.2d 723, 732, 275 N.W.2d 660 (1979). We have reviewed our previous cases and found in them no recognition of a legal basis upon which a third-party claimant may recover from the tortfeasor's insurer for failure to settle a claim. After careful consideration, we also declined to recognize the existence of such a right of action. Finally, we have searched the insurance laws and related administrative rules and concluded there is no such right of action by implication in those provisions. Because we conclude a third-party claimant cannot assert a bad-faith claim against an insurer, it follows that there is no set of facts the petitioner herein could prove in support of his claim. The test of dismissal is met.

As a final observation, we note that some of the petitioner's allegations in this case deal with the insurer's alleged tactics in protracting the litigation and preventing the matter from coming to trial. Our decision in this case does not mean that a plaintiff is without remedy

when an opposing party exhibits such behavior. Sec. 802.10(2), Stats., states that "all actions and special proceedings are deemed ready for trial one year after the summons and complaint are filed." Subsection (3) provides that a party may at any time after ninety days from the filing of the summons and complaint move for a scheduling conference, at which the procedural future of the case, including the establishing of discovery completion dates, motion dates, pretrial and trial dates, can be set. As provided in subsection (3)(d), violation of a scheduling order is subject to the provisions of sec. 805.-03, which give the trial judge great latitude in bringing the recalcitrant party into line, including, if necessary, rendering a judgment by default or treating failure to obey the court's order as contempt. We also point out that Supreme Court Rule 20.36(1)(a) states that a lawyer must not:

"File a suit, assert a position, conduct a defense, delay a trial or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another."

Under Supreme Court Rule 21.05(4), the violation of the attorney's Code of Professional Responsibility is a ground for discipline. We express no opinion whether any of these remedies would have been warranted in this case but merely observe that apparently no such remedy was sought by the aggrieved party.

*By the Court.*—The decision of the court of appeals is affirmed.

HEFFERNAN, J. (*concurring*). The majority opinion performs a service to the legal profession in its clear explanation of the basis for recognizing the causes of action sanctioned in *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 231 N.W. 257, 235 N.W. 413 (1931);

*Alt v. American Family Mut. Ins. Co.*, 71 Wis.2d 340, 237 N.W.2d 706 (1976); *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978); and *Coleman v. American Universal Ins. Co.*, 86 Wis.2d 615, 273 N.W. 2d 220 (1979). The majority ably points out that liability in each of these cases results from the breach of a quasi-fiduciary duty, which has its origin in an insurance contract. It is clear, therefore, as the majority points out, that whatever recourse a third-party claimant may have arises from a concept that is substantially foreign to that utilized in the cases cited above. That conclusion, which I deem to be correct, does not necessarily mandate the legal conclusion that a third-party claimant may not have a cause of action against an insurance company which has indulged in "tactics of harassment and delay . . . meant to cause [a plaintiff] to give up her claim and to minimize the amount of the defendant's liability."

The basic question is not whether the conduct fits a pattern established by prior cases, but whether the actions of the defendant alleged here, assuming proper pleadings and proof, constitutes any tort for which damages may be awarded.

The majority opinion, following the argument of the insurance company defendant, takes the position that the possibility of a commission of a tort is dependent on the prior relationship of the parties. This, I conclude, is contrary to basic tort law. What is alleged here is an intentional tort, whose purpose is to unfairly economically advantage the defendant and to disadvantage the plaintiff in a claim against an insurance company whose liability for the purpose of this review is considered to be substantially unquestioned. But intentional torts are dependent not upon prior relations, but rather arise out of the relationship created by the conduct of the tortfeasor. It needs no citation to demonstrate that a civil action for damages for assault and battery may lie whether the

aggrieved person had ever previously had any relationship or contact with the tortfeasor.

It would be the height of temerity in this concurrence to attempt to definitively address the full scope of the meaning of "tort." Prosser in his introduction to his hornbook, *Law of Torts* (1971), attempts to do so and acknowledges that the field is so broad that it is impossible to encapsulate in a brief definition the entire common law philosophy under which individuals are entitled to recompense in a civil action as a result of the wrongdoing of others. One thing, however, that Prosser makes eminently clear is that a tort is a civil wrong "other than breach of contract." (sec. 1, p. 2) Thus a contractual relationship as a general proposition is totally alien to the tort concept.

It is true, of course, as our previously decided cases on the general subject of the duties of insurers demonstrate, that parties may be thrust into a relationship as the result of contract which makes possible tortious conduct, but it is obvious that such a relationship is not always a necessary prerequisite.

While I am not inclined at this time to disagree with the separate concurring opinion of Justice Abrahamson that third-party claimants, as a matter of public policy, derive certain rights under an insurance contract, some breaches of which may be a tort, I think it unnecessary in this case to follow that rationale, although it may well be correct. Rather, the philosophical and jurisprudential basis of tort law is, as stated by Prosser, sec. 1, p. 3, that "[the] injuries are to be compensated, and anti-social behavior is to be discouraged."

It is my understanding, therefore, that, when there is conduct which causes injury to a person and when future conduct of that nature may be deterred by the civil remedy of damages, a cause of action for tort may well exist. Prosser further points out:

"When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy." (sec. 1, pp. 3–4)

It is true, of course, that the righting of all wrongs, irrespective of the nature of the wrong or the nature of the injury, is a project that courts should not undertake. There are many moral wrongs which the courts consider themselves powerless to rectify. But what we have alleged in the instant case is an alleged wrong which purports to defeat the purpose of our system of justice, as well as to defeat the wronged person's right of recovery. Hence, there is a societal injury which is of general concern to the legal system. The societal wrong is not only the subversion of the courts as an instrument of justice, but is also the subversion of society's interest in seeing to it that persons injured by negligent conduct are promptly compensated for their injuries, lest they become a burden upon the community.

I share the reasoning of the concurrence of Justice Abrahamson to the extent that the facts alleged in this case do not clearly spell out the elements of a possible tort to the third-party claimant. But more importantly, I am satisfied that the existence of an intentional tort of this nature depends not at all upon the prior contractual relationship of the parties. Rather, it depends upon the relationship between the parties whatever the origin of the relationship may be. That relationship, giving rise to a cause of action, may be found in the conduct of the parties themselves. In this instance, the possible tort arises from the alleged conduct of the insurance company toward the claimant after a claim had been made.

To distinguish the fact situation here from those in which we found the existence of a tort cause of action

because of a breach of a fiduciary duty arising out of contract is not at all determinative of whether an insurance company may be a tortfeasor in relation to a third-party claimant. All that the insurance company's argument proves is that the particular tort alleged here cannot be justified on the same concepts we have utilized in our prior cases.

I concur in the result but would withhold any attempt to definitively say that a cause of action of the type sought to be alleged here has no existence, or should not, under proper pleading, be recognized by the common law of this state.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). I concur in the result because, even if the court decided to recognize a third-party victim's cause of action against the insurer for bad faith, the complaint in the case at bar does not state a claim of bad faith as set forth in *Anderson v. Continental,* 85 Wis.2d 675, 691–693, 271 N.W.2d 368 (1978), upon which relief can be granted. *Cf. Drake v. Milwaukee Mut. Ins. Co.,* 70 Wis.2d 977, 984, 236 N.W.2d 204 (1975).

I am not, however, persuaded by the majority's effort to distinguish the third-party victim's bad-faith claim from the first-party insured's bad-faith claim. The majority reasons that the insurer and the insured are contracting parties, that the law imposes a duty of good faith and fair dealing on contracting parties, and that the first-party insured may recover for the insurer's tortious breach of that duty.[1] The majority further reasons that

[1] The majority's "contract" cases are *Hilker v. Western Automobile Ins. Co.,* 204 Wis. 1, 231 N.W. 257, 235 N.W. 413 (1931); *Alt v. American Family Mut. Ins. Co.,* 71 Wis.2d 340, 237 N.W.2d 706 (1976); *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978); and *Coleman v. American Universal Ins. Co.,* 86 Wis.2d 615, 273 N.W.2d 220 (1979). *See also Davis v. Allstate Ins. Co.,* 101 Wis.2d 1, 303 N.W.2d 596 (1981).

the insurer and victim are not contracting parties and that the insurer has no contractual duty of good faith and fair dealing to the third-party victim, a stranger to the contract. The majority then concludes that the insurer cannot be held liable under common law to the third-party victim for an alleged tortious breach of a non-existent duty. I find an important step missing in this reasoning, namely the majority's failure to discuss or decide whether the law should impose on the insurer a duty of good faith to the third-party victim in the absence of a contractual relation between the insurer and the victim. For the majority to assert that the duty does not exist because there is no privity of contract is simply to restate the question presented to the court as a conclusion.

Accepting the majority's assertion that privity of contract is required for the maintenance of a bad faith claim, I would conclude that privity of contract exists on the facts of the instant case. The third-party victim in this case is the spouse of the insured and is closely related in interest to the insured. The spouse is, by statute, protected by the policy. The legislature has provided that no motor vehicle accident policy may exclude a spouse of the insured from the coverage afforded or benefits provided by the policy. Sec. 632.32(6), Stats. 1979–80; *Haines v. Mid-Century Ins. Co.*, 47 Wis.2d 442, 177 N.W.2d 328 (1970). Thus the third-party victim in this case is not a "stranger to the contract and to the fiduciary relationship it signifies" (majority opinion,

---

I agree with the majority that it would be a strained interpretation of the insurance statutes and regulations cited by the majority to conclude that the legislature intended these provisions to provide a private remedy. The legislature has neither provided for nor prohibited a private cause of action. *See Walker v. Bignell*, 100 Wis. 2d 256, 269–273, 301 N.W.2d 447 (1981); *Wells v. Chicago & North Western Transportation Co.*, 98 Wis.2d 328, 331–40, 296 N.W.2d 559 (1980); *Cort v. Ash*, 422 U.S. 66 (1975); Note, *Implied Causes of Action in the State Courts*, 30 Stan. L. Rev. 1243 (1978).

*supra* p. 73). The spouse can be said to be an insured or a third-party beneficiary of the policy. The majority's conclusion that the insurer owes a duty of good faith in settling claims of the first-party insured husband but owes no duty of good faith in settling the claims of the third-party victim wife is not persuasive.

Even if the third-party victim were not the spouse of the first-party insured, in my view the insurance contract places the insurer in such a relationship with the victim that the victim is a third-party beneficiary of the insurance contract.[2] As the majority recognizes, the insurance contract imposes an obligation on the insurer to deal fairly and in good faith on behalf of and in the interest of the insured. The contract creates a similar duty to any third-party beneficiary. Restatement (Second) of Contracts sec. 135 (Tent. Draft No. 3, 1967).

---

[2] "The responsibility of a contracting party to a third person with whom he has made no contract has a long history, and has presented problems of greater difficulty than those surrounding the relations of the immediate parties to the contract. The first obstacle which arises is the fact that there has been no direct transaction between the plaintiff and the defendant, which usually is expressed by saying that they are not in 'privity' of contract. There is thus no logical basis upon which the one may be required to perform the contract for the other, unless the contract has been made expressly for the benefit of the plaintiff, or it has been assigned to him.

"In other words, the absence of 'privity' between the parties makes it difficult to found any duty to the plaintiff upon the contract itself. But by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person." Prosser, *Torts* 622 (4th ed. 1971) (notes omitted).

*See also* 4 Corbin, *Contracts* ch. 41 (1951); Restatement (Second) of Contracts secs. 133, 135 (Tent. Draft No. 3, 1967).

Our society regards the victim as a beneficiary of the insurance contract. Insurance is considered by both the insured and society as a means of compensating the injured person. As Professor Robert E. Keeton wrote, "liability insurance has come to be used openly and extensively as a device for insuring compensation to victims." R. Keeton, *Insurance Law, Basic Text* 233 (1971). It is well recognized that liability insurance is purchased by the first-party insured not only to protect the insured's assets but also to provide financial protection to anyone injured by the insured. 4A Corbin, *Contracts* sec. 807, pp. 213–216 (1951).

Legislative endorsement of this societal construction of insurance is shown by the enactment of direct action statutes, compulsory automobile liability insurance laws, and financial responsibility laws. These laws are predicated on the theory that the third-party victim is a third-party beneficiary of the insurance contract. The Wisconsin direct action statute, sec. 803.04(2), Stats. 1979–80, financial responsibility laws, ch. 344, Stats. 1979–80, workers compensation laws, Ch. 102, Stats. 1979–80, and various insurance laws, *see, e.g.*, secs. 601.01 (2), 632.34(2), (3), (6), 632.35, Stats. 1979–80, can be read, as the majority concedes, as legislative recognition of the victim as an intended beneficiary of the insurance policy.

These statutory indicators support treating the third-party victim as a third-party beneficiary of the insurance contract for purposes of a bad-faith claim. Support for this position was expressed by a law review commentator who concluded that "[t]here seems to be no cogent theoretical objection to treating injured people as intended beneficiaries of the policy covenant to pay liability incurred by the insured within policy limits." Note, *Liability Insurers and Third-Party Claimants: The Limits of Duty*, 48 U. Chi. L. Rev. 125, 144 (1981).

My view that the insurer has a duty of good faith to the victim arising from the insurance contract, if rejected, does not necessarily lead to acceptance of the majority's conclusion. The majority does not explain why the insurer's common law duty of good faith may arise only from the insurance contract or why the insurer's common law liability to the victim for its bad-faith settlement practices should be dependent solely on concepts of privity of contract. Non-contractual relationships can give rise to a common law duty of good faith.

The majority reasons that the bad-faith tort claim of the insured against the insurer rests on breach of a contractual duty, that if there is no contract there is no duty, and if there is no duty there is no tort. The commentators, however, have pointed out that the duty of good faith and liability for the breach thereof originate not from the words of the contract but in principles of justice. While the duty of good faith arose in our prior cases (*see* cases in note 1) from the contractual relation, in essence it is a duty imposed upon parties by the court to do justice between the parties. The duty of good faith is one imposed not by the express words of the bargain of the parties but by the courts on public policy grounds. Professor Holmes described the origin of the extra-contract claims in equitable principles as follows:

". . . The theory underlying extra-contract claims originates in equity. The sources of this theory are the great principles of equity—conscience and good faith—which have made a two pronged attack upon contractual abuses permitted by the classical contracting theory. Both are policing devices. . . . Thus the equitable good-faith principle authorizes courts to impose terms and duties in accord with the parties' expectations and to grant equitable damages for nonperformance." Holmes, *Is There Life After Gilmore's Death of Contract?— Indications From a Study of Commercial Good Faith in First-Party Insurance Contracts*, 65 Cornell L. Rev. 330, 371, 372 (1980).

The equitable principles of conscience and good faith are not by their nature limited to contractual relationships; these principles govern other relationships as well. Thus the question presented in this case is whether these concepts of fair dealing and public policy dictate that the court impose a duty of good faith on the insurer while negotiating with the third-party victim and liability for the tortious breach of the duty. This statement of the issue comports with precedent of this court.

This court has frequently acknowledged that when the court decides whether a defendant has a legal duty so that there is liability for the tortious breach of that duty, the court is making a policy determination. *Fisher v. Simon,* 15 Wis.2d 207, 211–212, 112 N.W.2d 705 (1961). The most recent discussion of the elusive concept of duty by this court appears in *Walker v. Bignell,* 100 Wis.2d 256, 301 N.W.2d 447 (1981), an opinion authored by the author of the majority opinion. The *Walker* court quoted with approval Dean Prosser's analysis of the concept of duty as follows:

" ' ". . . *There is a duty if the court says there is a duty; the law, like the constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question.* When we find a duty, breach, and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the

general understanding of mankind.' " ' (Emphasis supplied.)"[3]

In *Walker v. Bignell, supra* 100 Wis.2d at 266, and in *Ollerman v. O'Rourke Co., Inc.*, 94 Wis.2d 17, 27–43, 288 N.W.2d 95 (1980), the court analyzed the question of imposing a duty and common-law tort liability on a party "as a matter of public policy." In this case the majority does what the court said in *Walker v. Bignell* it would not do. The majority grounds its holding that the insurer is not liable "upon the somewhat nebulous concept of duty," rather than by "declar[ing] [nonliability] directly . . . as a matter of public policy," *Walker v. Bignell, supra* 100 Wis.2d at 265, 266, and thus the majority, without explanation, deviates from the path marked by our past decisions. I believe an analysis of public policy considerations is necessary to decide the question presented in this case.

There are public policy reasons justifying the recognition of the insurer's duty of good faith to the third-party victim. Society has an interest in the just settlement of insurance claims, and this societal interest is substantially the same whether the injured party is the insured or a third-party.

A third-party victim seeking recovery from the insurer is, as I see it, in substantially the same position as the first-party insured seeking benefits under a casualty policy. Both parties have been injured and both parties look to the insurance company for payment. When seeking payment under the policy both parties are in an adversarial relation with the insurance company. Both parties are generally in a relatively weaker bargaining position than the insurance company. Both parties can

---

[3] *Klassa v. Milwaukee Gas Light Co.*, 273 Wis. 176, 183–184, 77 N.W.2d 397 (1956) quoting Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 14–15 (1953). This passage is also quoted in *Ollerman v. O'Rourke Co., Inc.*, 94 Wis.2d 17, 28, 288 N.W.2d 95 (1980).

suffer as a result of the insurer's bad faith in settlement practices, and both parties may incur additional damage if payment of the claim is delayed. I recognize that the insured does buy the policy and pay the premiums and that the insurer and insured have obligations to each other under the contract which they do not have to the victim and which the victim does not have to them. Although the majority apparently takes the opposite view, I do not believe that the mutual obligations of the insurer and the insured are inconsistent with imposing on the insurer a duty to negotiate with the third-party victim in good faith.

I conclude that the interests of the insured and the third-party victim as to the settlement practices of the insurer are largely the same and that the public has an interest in the settlement practices of the insurer whether the insurer is dealing with the insured or with a third-party victim. Insurance holds an important place in our industrial society. Insurance is recognized by the insured, the victim, the legislature and the public as a system for compensating the third-party victim for injuries caused by another. Imposing a duty on the insurer to negotiate in good faith with the third-party victim is consistent with the intent of the first-party insured and of the legislature and with the popular concept of insurance which views the third-party victim as an intended third-party beneficiary of the insurance contract.

Although there is a significant public interest in protecting claimants (first-party insureds and third-party victims) from unfair and oppressive tactics of insurers, I recognize that there are significant countervailing public policy considerations supporting the non-recognition of a third-party victim's cause of action in tort against the insurer for bad faith. Commentators point out that, except where injury is measurable by the excess judgment, damages are difficult to calculate in bad-faith suits; that allowing the third-party victim to prove a

cause of action for bad faith may have a prejudicial impact on the jury if the case goes to trial; that recognizing a third-party victim's bad-faith cause of action might increase the number of lawsuits and might increase the number of and amount of settlement offers because of the possibility of punitive damages; that increased costs to the insurer resulting from recognizing this cause of action might be passed on to the insureds making insurance protection more costly and less available; and that the insurance industry is subject to complex and extensive regulation and that this court should not on the basis of common law principles recognize a bad-faith cause of action to third-party victims.[4]

As one commentator wisely noted, these same arguments against third-party victims' bad-faith claims are applicable to the court-recognized first-party insured's bad faith suit,[5] and to the court-recognized employee workers compensation bad faith claim, *Coleman v. American Universal Ins. Co.*, 86 Wis.2d 615, 273 N.W.2d 220 (1979). Apparently the court made the basic policy decision in our prior cases that the value of recognizing the claims of bad faith in the circumstances of those cases outweighed the disadvantages. The majority, without explanation, apparently leaves unanswered the question whether as a matter of public policy it will recognize the claims of bad faith by third-party victims against insurers. Until this court takes a position on the question, the problem of defining the existence, scope and enforceability of the insurer's obligation of good faith in dealing with third-party victims is for the Commissioner of Insurance and the legislature.

---

[4] Comment, *Extending the Insurer's Duty of Good Faith and Fair Dealing to Third Parties Under Liability Insurance Policies*, 25 UCLA Law Rev. 1413, 1437–1441 (1978); Comment, *Liability Insurers and Third-Party Claimants: The Limits of Duty*, 48 U. Chi. L. Rev. 125, 151–152 (1981).

[5] Comment, *Liability Insurers and Third-Party Claimants: The Limits of Duty*, 48 U. Chi. L. Rev. 125, 151 (1981).