BAKER, Respondent, v. NORTHWESTERN NATIONAL CASUALTY COMPANY, Appellant.*

*January 4—February 2, 1965.*

* Motion for rehearing denied, with costs, on March 30, 1965. Previously reported in 13 Wis. (2d) 637, and 22 Wis. (2d) 77.

308

For the appellant there were briefs and oral argument by *Ray T. McCann* of Milwaukee.

For the respondent there was a brief by *Aberg, Bell, Blake & Metzner* of Madison, and oral argument by *Carroll Metzner*.

GORDON, J.

### The Insurer's Violations of Duty.

In ruling upon Northwestern's motion for summary judgment, this court considered various duties on the part of an insurer which relate to whether it has acted in good faith in failing to settle the claim. *Baker v. Northwestern National Casualty Co.* (1963), 22 Wis. (2d) 77, 125 N. W. (2d) 370. Referring to *Hilker v. Western Automobile Ins. Co.* (1930, 1931), 204 Wis. 1, 231 N. W. 257, 235 N. W. 413, we discussed three specific duties on the part of the insurance carrier.

The first duty recited in the 1963 *Baker Case* (p. 82) was that the insurance company "must have made a diligent effort to ascertain the facts." The second duty discussed (p. 83) was that devolving upon the insurer, after an investigation reveals the probability that a recovery will exceed the indemnity, " 'to indicate such fact to the insured, to the end that he may take such steps as may be open to him for his own protection' ". The third duty considered (p. 83) was "that of keeping the insured timely and adequately informed of any offers of settlement received from the claimant and of the progress of any settlement negotiations."

The first question of the special verdict consisted of three parts and inquired into the jury's resolution of the factual issues surrounding the alleged violation by Northwestern of its duties described above. The following are the questions and the jury's answers thereto:

*"Question One:*
"Was the defendant, Northwestern National Casualty Company, negligent with respect to:

"a) Failing to make a diligent effort to ascertain the facts upon which an intelligent and good faith evaluation could be made of the claim of Robert Walker? *Answer:* Yes.

"b) Failing to indicate to its insured, Frederick L. Baker, Jr., that a recovery could exceed his policy limits to the end that he might take such steps that might be open to him for his own protection? *Answer:* Yes.

"c) Failing to keep its insured, Frederick L. Baker, Jr., timely and adequately informed of any offers of settlement received from claimant, and of the progress of settlement negotiations? *Answer:* Yes."

Upon this appeal, Northwestern urges that the evidence does not support the jury's answers to each part of Question One of the special verdict. Our examination of the record persuades us that there is credible evidence to sustain the jury's responses.

Did Northwestern fail to make a diligent effort to ascertain the facts? The company may have been misled by its adjuster's report that Mr. Walker had made "quite a good recovery." The adjuster stated that he had procured this information by way of "the grapevine;" the fact was that Mr. Walker had sustained several permanent disabilities. His right knee was permanently restricted in motion; his legs were of unequal length; his jaw was permanently injured so as to limit the extent that he could open his mouth. In addition, Mr. Walker was obliged to undergo surgery (after the date of the adjuster's report), which involved two and one-half hours under general anesthesia and a two weeks' hospitalization. He was also advised that he might incur substantial future medical and dental care.

The record contains evidence from which the jury may have concluded that Northwestern was not diligent in that the company failed to obtain medical reports concerning the permanence of Mr. Walker's jaw injury. Although North-

western's attorney expressly requested that the company make arrangements for its own examinations of Mr. Walker by an oral surgeon, there is no evidence that the company did so.

Northwestern's representatives did not get in touch with Mr. Walker's employer to determine his job status both before and after the accident. It is noted that in evaluating Mr. Walker's damages the jury found that he had incurred a past wage loss of $5,748 and would sustain a future wage loss of $4,160. Both of these findings as to wage loss were affirmed upon the appeal to this court.

Upon this record the jury was warranted in concluding that there was a probability of an overage and, therefore, that Northwestern was duty bound to apprise its insured so that he could take his own protective steps if he chose to. It is obviously difficult to decide in advance when an overage may be "probable." One court observed cynically, "It is always probable that something improbable will happen." *Warren v. Purtell* (1879), 63 Ga. 428, 430. No simple guidelines are available; each case will depend on its own peculiar facts.

While Mr. Baker was aware that the claim of Mr. Walker was for a sum greater than the limits of his insurance policy, Northwestern did not advise Mr. Baker of his right to have independent counsel to protect him with regard to overage judgment. Mr. Baker consulted an attorney as to the claim for his own damages against Mr. Walker; on the other hand, there is no evidence that Mr. Baker either was informed by Northwestern or learned from independent sources that he was entitled to his own representation with reference to an overage notwithstanding the fact that he was obliged to surrender control of the defense to his insurer.

The record also contains credible evidence to support the jury's finding that Northwestern did not keep Mr. Baker

adequately informed of compromise offers and of the progress of settlement negotiations. Several settlement opportunities occurred which were not transmitted to Mr. Baker. We recognize that an attorney does not have to take seriously *all* comments relating to settlement. Occasionally remarks are made between competing counsel which are of a bantering nature and are not meant to be taken seriously. We do not suggest that such casual conversations need be forwarded by an insurer to its policyholder or by an attorney to his client. However, in a case involving a probable overage, an insurance carrier must be circumspect to communicate all offers which are not patently jocular or frivolous.

In the instant case, it would appear that the only proposal that was transmitted to Mr. Baker was one which would have necessitated his paying approximately $6,000 toward the settlement. Northwestern concedes that it also received a written offer to settle Mr. Walker's claim for $25,000 plus costs. The fact that this offer was withdrawn a few weeks later does not relieve Northwestern from the onus which attended its failure to have communicated the existence of the proposal to its insured.

On May 27, 1960, Northwestern received a letter from its attorney, Mr. Block, which contained the following statement: "Present demands for settlement are $25,000.00."

In addition, the record discloses that there was a conference with the trial judge on June 24, 1960, which was attended by the various attorneys. At that time, Mr. Berg, the attorney for Mr. Walker, had the following discussion with Mr. Block, the attorney for Northwestern:

"*Mr. Berg:* Judge, I would like to ask Mr. Block, can this case be settled for $25,000 at this point?

"*Mr. Block:* I can't answer the question, because it is not pertinent to the issues involved at all. Therefore, I cannot answer the question on the record; I don't think it has any place in the issues in this case."

Another discussion as to settlement was described by Mr. Jackman, the attorney who was representing Mr. Walker on the counterclaim by Mr. Baker. Mr. Jackman said that he recollected the offer by Mr. Berg to settle for $25,000 and also gave the following testimony:

"*A*. . . . I told Mr. Block that I believed that if he could raise $22,000.00 or $23,000.00 to settle the case that Mr. Berg would recommend to his client that he do so.

". . .

"*A*. On Saturday morning we were called back by the Judge to frame a verdict. Shortly before, as I recall, that conference began, Mr. Block asked Mr. Berg if Mr. Berg would settle the case for $22,000.00 or $23,000.00. Mr. Berg then replied, as I recollect, that he would have to take it up with his client, but he first wanted to know if Mr. Block had authority to make a firm offer before he would take it up with his client, and Mr. Berg said he would be around Janesville all weekend, and if Mr. Block would get in touch with his company and then get in touch with Mr. Berg when he had authority, Berg would let him know promptly.

"*Q*. Did you make further inquiry on Monday morning whether anything had developed from that? *A*. When we came back Monday morning I asked Mr. Berg what had transpired, and he said nothing."

Since these several settlement prospects were not passed on to Mr. Baker, according to his testimony, the jury could properly conclude that under the circumstances Northwestern failed in a duty it owed to its insured.

### The Finding of Bad Faith.

The jury determined that Northwestern's refusal to settle within its policy limits was an act of bad faith toward Mr. Baker. In the absence of bad faith, a policyholder cannot surcharge an overage against his insurance company merely because of negligence on the part of the latter in

deciding to litigate rather than to settle. *Baker v. Northwestern National Casualty Co.* (1963), 22 Wis. (2d) 77, 81, 125 N. W. (2d) 370; *Maroney v. Allstate Ins. Co.* (1961), 12 Wis. (2d) 197, 201, 107 N. W. (2d) 261; *Berk v. Milwaukee Automobile Ins. Co.* (1944), 245 Wis. 597, 601, 15 N. W. (2d) 834. The extent and character of the negligence, however, are factors to be considered by the trier of fact in weighing the matter of bad faith. To hold the carrier liable for the excess judgment, the insured must show by clear, satisfactory, and convincing evidence that the carrier acted in bad faith. In *Hilker v. Western Automobile Ins. Co. supra,* the nature of the insurance carrier's duty to exercise good faith is discussed.

The jury was entitled to conclude that the massive failure of Northwestern to carry out its duties considered above evidenced such a shocking disregard of its insured's interests as to constitute "a suggestion of dishonesty" or "a species of fraud," within the meaning of "bad faith."

It is noted that Mr. Reinertsen, a vice-president of the company, testified as follows:

"*Q.* Did you feel as long as the demands were up to the policy limits Northwestern had nothing to lose by trying the case, because the most they could lose would be $25,000? *A.* That is correct."

In our opinion, the record in the instant case demonstrates that the jury had before it clear, satisfactory, and convincing evidence upon which to base its determination of bad faith.

### The Instruction Regarding Bad Faith.

The appellant complains that the trial court erred in defining bad faith to the jury. After having commenced its deliberations, the jury returned to the courtroom and asked for further instructions as to the meaning of bad faith. The court then instructed the jury as follows:

"Now, 'bad faith' is a word of broad application, and it is very difficult to define it distinctly. However, I can tell you 'bad faith' is the opposite of 'good faith', and carries with it a suggestion of dishonesty. If a person does not act honestly and intelligently, then he acts in bad faith. Let me repeat those for you. Bad faith is the opposite of good faith, and carries with it a suggestion of dishonesty. If a person does not act honestly and intelligently, then he acts in bad faith. Does that help you?"

Although the issue was not raised in his brief, counsel for Northwestern on oral argument urged that in stressing intelligence the court in effect suggested that the jury could make a finding of bad faith based on a mere error of judgment.

The trial court could well have derived this terminology from the *Hilker Case,* where, at page 15, this court used the words "honest and intelligent" in considering whether the insurance company acted in good faith. Intelligence may be compatible with either good faith or bad faith. We now believe that it would be preferable to omit reference to intelligent action in defining the test of bad faith since it may be interpreted to equate bad faith with all conduct that is erroneous or negligent. It is only when such conduct evinces a significant disregard of the interests of the insured that it may be found to be in bad faith.

We do not deem the reinstruction to have been prejudicially improper. Considering the instructions in their entirety, we conclude that the insurer was amply protected by the instructions that bad faith "carries with it a suggestion of dishonesty" and is "a species of fraud."

### Standard as to Proof.

Appellant contends that the trial court applied the wrong standard in ruling on motions after verdict. The court said that there was "credible evidence" to sustain the jury's find-

ing of bad faith. The appellant urges that proof of bad faith requires "clear, satisfactory, and convincing evidence" and not merely "credible evidence."

We are satisfied that the trial court knew and applied the correct standard. In its instructions to the jury with reference to the question of the special verdict relating to bad faith, the trial court stated:

"The burden of proof for this question requires that you be satisfied or convinced to a reasonable certainty by evidence that is clear, satisfactory and convincing that this question should be answered 'yes'."

In using the term "credible evidence" when ruling on the motions after verdict, the trial court, we believe, was but abbreviating the more comprehensive statement of the required standard of proof. This court engaged in the same shortcut in *Kuehn v. Kuehn* (1960), 11 Wis. (2d) 15, 20, 104 N. W. (2d) 138.

### The Cross Complaint for Consequential Damages.

The trial court declined to submit to the jury any question concerning Mr. Baker's claimed damages in connection with his contemplated manufacture and sale of a hunting knife. It was Mr. Baker's contention that the excess judgment against him damaged his credit rating and his financial reputation.

At the time of the judgment, Mr. Baker's hunting-knife enterprise was in the planning stage. He had not yet begun to market his product. In our opinion, the trial court was correct in treating the claimed damages with reference to such new and unestablished business as speculative and remote. In *American Steam Laundry Co. v. Riverside Printing Co.* (1920), 171 Wis. 644, 650, 177 N. W. 852, the court stated:

"One of the elements for recovery of loss of profits is that they must be capable of ascertainment with reasonable certainty."

*Attorney's Fees.*

The judgment granted to Mr. Baker an allowance for attorney's fees in the sum of $9,100.37. The trial court concluded that Mr. Baker was to be placed in the same position he would have occupied if he had not been defrauded, and therefore "he must be allowed attorney's fees in the instant action." We reach a contrary conclusion.

Sec. 271.04, Stats., authorizes only $100 as an allowed cost for attorney's fees in a case of this magnitude; that is the only sum which the court could assess as costs. We will next consider whether any additional attorney's fees may be allowed as damages, as distinguished from costs.

As the learned trial court noted, one may recover those damages in a fraud action which are the natural and proximate result of the fraud. However, it does not follow that attorney's fees incurred are entitled to be included in the award of damages. In *Widemshek v. Fale* (1962), 17 Wis. (2d) 337, 342, 117 N. W. (2d) 275, Mr. Chief Justice BROWN stated:

". . . the law does not generally recognize attorney's fees as recoverable unless authorized by statute or contract, except when natural and proximate result of wrongful act by defendant has involved plaintiff in litigation with other parties. *Paper Makers Importing Co. v. Milwaukee* (1958), 165 Fed. Supp. 491."

See also *Hilgendorf v. Schuman* (1939), 232 Wis. 625, 629, 288 N. W. 184, where the court said with regard to attorney's fees:

"If plaintiff incurred such expenditures and costs in collateral litigation as a necessary and proximate result of the

deceit, they are recoverable as part of the damages sustained by him."

The distinction between attorney's fees arising in the action against the wrongdoer and such fees arising in action with some other party (but caused by the wrongdoer) was observed in the two cited Wisconsin cases, and it is also recognized in a number of other jurisdictions. For example, in the Louisiana case of *Commercial Credit Corp. v. Carrier* (La. 1962), 139 So. (2d) 256, there was a sale of a used car for which the buyer signed a note; the note was fraudulently altered by the seller and transferred to a third party. The court held that the buyer was not entitled to recover the attorney's fees which arose in his action against the seller, but he was allowed to recover from the seller those fees which the buyer incurred as a result of litigation with the third party.

Two other cases which have recognized the rule that one cannot recover as damages his attorney's fees which arise in the lawsuit against the wrongdoer to establish the latter's improper conduct are *Beiser v. Evered* (1957), 20 Conn. Supp. 365, 135 Atl. (2d) 741, and *Reese v. Griffin* (Tex. Civ. App. 1955), 281 S. W. (2d) 353.

If the person wronged has been involved in litigation with third parties because of the fraud, the defrauding party may later be held liable in an action against him for reasonable attorney's fees incurred in such other litigation. See *Thomason and Beggs v. Mosrie* (1950), 134 W. Va. 634, 60 S. E. (2d) 699, and *Skelly Oil Co. v. Universal Oil Products Co.* (1949), 338 Ill. App. 79, 86 N. E. (2d) 875.

In McCormick, Damages (hornbook series), p. 246, sec. 66, the author asserts this principle as follows:

"For the expense incurred in the *present* litigation, we have found that our law generally gives the successful party no recompense beyond the taxable costs which ordinarily

include only a portion of his expense. This is the case, however wrongful the suit or groundless the defense. On the other hand, where the present defendant has by his wrongful conduct, be it tort or breach of contract, caused the present plaintiff to defend or prosecute *previous* legal proceedings, the law reverses its restrictive attitude and allows the plaintiff to recover all the expense, including counsel fees, reasonably incurred by him in the prior litigation."

It follows that Mr. Baker may not recover attorney's fees (beyond the statutory costs) which he incurred in prosecuting his overage suit against Northwestern. However, if not barred for some other reason, it may be possible for Mr. Baker to recover attorney's fees incurred by him in his litigation with third persons if such dealings were occasioned by Northwestern's wrongdoing. This possibility necessitates our examining the nature of the circumstances under which the attorney's fees were created.

Some of the attorney's fees resulted from the effort by Mr. Baker to resist garnishment actions brought by Mr. Walker in pursuance of the latter's effort to collect his judgment. There were also attorney's fees incurred in connection with the creation of a trust in favor of Mr. Baker's mother; the latter trust constituted a divestment by Mr. Baker of certain of his assets. Additional fees related to advice concerning the wisdom of Mr. Baker's going into bankruptcy. Attorney's fees created by consultation and advice were held not recoverable in *Paper Makers Importing Co. v. Milwaukee* (1958), 165 Fed. Supp. 491.

In our opinion, the garnishment, trust, and bankruptcy fees cannot properly be included as damages for the reason that Mr. Baker was obligated to pay the judgment against him. In a sense, such efforts at circumvention constitute a failure on his part to minimize his damages. *O'Brien v. Isaacs* (1962), 17 Wis. (2d) 261, 116 N. W. (2d) 246. The judgment in favor of Mr. Walker against Mr. Baker

was valid and final, and there was a duty on the part of Mr. Baker to pay it. The attorney's fees incurred in avoiding payment are not fairly to be denominated "a natural and proximate result" of Northwestern's wrongful conduct.

The fees which were paid by Mr. Baker in connection with his development of the hunting-knife enterprise are not chargeable for the reason that the claims attendant to such activity were too speculative to qualify as damages, as has been noted earlier in this opinion.

### Conclusion.

The judgment must be modified to exclude attorney's fees except for $100 allowable as costs under sec. 271.04, Stats. Costs upon this appeal are to be awarded in favor of the appellant. The motion to review should be denied.

*By the Court.*—Judgment modified as directed in the opinion and, as modified, affirmed.