**A.W. HUSS COMPANY,**
**Plaintiff-Appellant,**

v.

**CONTINENTAL CASUALTY**
**COMPANY,**
**Defendant-Appellee.**

**No. 83–1661.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1984.

Decided May 16, 1984.

As Amended May 16, 1984.

---

Howard A. Davis, Habush, Habush & Davis, S.C., Milwaukee, Wis., for plaintiff-appellant.

Jack R. Wiedabach, Prosser, Wiedabach & Quale, S.C., Milwaukee, Wis., for defendant-appellee.

Before CUMMINGS, Chief Judge, and WOOD and POSNER, Circuit Judges.

CUMMINGS, Chief Judge.

The appeal in this diversity case presents the question whether Wisconsin law recognizes a cause of action by the insured against the insurer for alleged bad faith in handling a third party claim where the insurer settled the claim within the insured's policy coverage. We affirm the district court's holding that Wisconsin law does not recognize such a bad faith cause of action.

I

Defendant-appellee Continental Casualty Company (Continental), an Illinois corporation, issued to plaintiff-appellant A.W. Huss Company (Huss), a Wisconsin corporation, two insurance policies: (1) a policy of comprehensive automobile liability insurance effective June 1, 1976 to June 1, 1977 with bodily injury limits of liability of $100,000, and (2) an umbrella excess third party liability policy effective June 1, 1976

to June 1, 1977 with liability limits of $1,000,000 per occurrence. On May 20, 1977, and within the effective period of the aforedescribed coverages, a truck owned by Huss and driven by one of its employees collided at a Manitowoc, Wisconsin, intersection with an automobile driven by Patricia Mangin. The impact of the truck severely affected passenger William Mangin, Patricia's brother, who was rendered unconscious. Due to the accident he walks with a limp, must wear a back brace, and suffers from numerous other severe physiological impairments.

William Mangin subsequently commenced an action in Wisconsin circuit court against Huss arising out of the accident and Continental retained counsel to defend Huss against the suit. Continental's obligation to defend Huss is embodied in the comprehensive automobile liability policy issued to Huss, which provides in pertinent part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> C. bodily injury or
> D. property damage
>
> to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use, including loading and unloading, of any automobile, and the company shall have the right and duty to defend any suit against the insured seeking damages of such bodily injury or property damage, even if any of the allegations of this suit are groundless, false or fraudulent, *and may make such investigation and settlement of any claim or suit as it deems expedient,* but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements. (Supp.App. p. 10) (emphasis added).

Continental investigated the claim and entered into extensive settlement negotiations with Mangin's attorney. After the accident it was unclear to the parties in the Wisconsin suit whether Huss also had an umbrella policy. Continental's initial settlement offers were in the $50,000 to $75,000 range and were rejected by Mangin. Continental's agent handling the claim learned of the $1 million umbrella coverage in September 1977, but Mangin's attorney through his inquiries did not learn of the umbrella coverage until March 1979. The proposed settlement figures increased, supported by early indications that Huss' driver may have been exceeding the speed limit at the time of the accident. In a July 23, 1979, letter to Huss, Continental's attorney advised that Huss "may want to retain personal counsel in this case" and that Continental would cooperate with any counsel retained by Huss (Ex. Q). Plaintiff retained two attorneys as of August and October 1979. Settlement negotiations continued, Continental settling the claim within the policy limits in May 1981, before trial in the amount of the total policy coverage—$1.1 million. The case was dismissed on May 18, 1981, and Continental paid the entire settlement of $1.1 million.

Huss commenced this action against Continental claiming Continental acted in bad faith in settling the Mangin action. Huss alleges Continental delayed settlement, and that Continental had knowledge to the effect that Huss' liability was clear and Huss clearly would have been liable for damages far in excess of the $1.1 million policy limit had Continental not settled. Huss cites a letter from Continental's attorney to Huss dated July 31, 1979, which discusses the opinions of reconstruction experts in the case which opined that Huss' driver was exceeding the speed limit when the accident occurred. At this point in time, asserts Huss, Continental possessed the knowledge that Huss clearly would have been liable for a substantial excess judgment had the action gone to trial. Huss reasons that Continental had a duty to settle the case at this time, and not in May 1981. Huss claims $1,000,000 damages for "concern", "anxiety", and business loss, $13,207.01 in attorneys' fees allegedly incurred in moni-

toring Continental's activities in defending the claim asserted against Huss, attorneys' fees for prosecuting this action, and $2,000,000 punitive damages. It also contends that Continental's delays caused Huss to seek the protection of Chapter 11 of the Bankruptcy Code.

Continental moved for summary judgment on February 1, 1983, on the grounds that no genuine issue of material fact exists and defendant is entitled to judgment as a matter of law. Although Continental denies Huss' allegations as indicated in Continental's answer to Huss' complaint, for purposes of summary judgment Continental accepted Huss' allegations as true in an effort to reach the dispositive legal issue in this case. Continental asserted in its motion that Wisconsin law (the parties do not dispute that Wisconsin law governs this case) does not recognize plaintiff's purported bad faith cause of action. Although as Continental conceded, the Wisconsin courts have never specifically addressed the precise substantive issue raised in this case, defendant argued that the Wisconsin Supreme Court, in related decisions, has clearly defined the permitted scope of a bad faith cause of action against an insurer arising out of a third party liability insurance contract. Outside of the worker's compensation context, defendant argued that under Wisconsin law an insurer can be sued for bad faith regarding the insurer's conduct in settling a third party claim only where the insured was found liable for a judgment in excess of the policy coverage. In this case Continental defended and settled the claim within the policy limit, Huss escaping with impunity. Accordingly, as Continental argued, it fulfilled its duty toward Huss under Wisconsin law.

On March 24, 1983, 560 F.Supp. 513 the district court, 560 F.Supp. 513 entered an order granting Continental's motion for summary judgment. Judge Evans in reviewing Wisconsin case law observed that no legally cognizable damage occurred as a result of defendant's alleged bad faith without harm inuring to plaintiff by virtue of liability in excess of the policy coverage. We agree and therefore affirm.

## II

In Wisconsin as in many states the doctrine of bad faith in insurance claims is a case law development. An analysis of this development reveals that Wisconsin courts have accepted three types of bad faith claims against insurers. Plaintiff's theory does not comport with any of these three claims, nor are we as a federal appellate court in a position to create a fourth.

The three bad faith insurance actions recognized in Wisconsin are (1) an insured's action against the insurer for bad faith in settling the case with the third party claimant where the ultimate judgment exposes the insured to a judgment in excess of the policy coverage; (2) in the first party context, *i.e.*, only the insured who suffers an insurable loss and the insurer are involved, a bad faith action against the insurer for failure to satisfy the insured's non-debatable claim; and (3) in the third party context, a bad faith action by the third party based on the insurer's failure to reimburse the third party for a worker's compensation claim. See *Kranzush v. Badger State Mutual Casualty Co.*, 103 Wis.2d 56, 307 N.W.2d 256 (1981) (reviewing the three categories of bad faith insurance actions under Wisconsin law). A brief discussion of these three types of actions is helpful to understand better why plaintiff's claim does not fall within any of these categories.

The first category of bad faith actions has its origin in *Hilker v. Western Automobile Insurance Co.*, 204 Wis. 1, 231 N.W. 257 (1930), on rehearing, 204 Wis. 12, 235 N.W. 413 (1931). There the plaintiff who was insured by defendant paid to the injured third party claimant the excess judgment of $5,500 over the $5,000 coverage of plaintiff's automobile indemnity policy. Plaintiff sued the insurer for the $5,500 excess judgment, alleging that the insurer could have settled for a sum less than $5,000. The jury agreed, found that the insurer acted in bad faith toward the insured in failing to make such settlement, and judgment was entered on the verdict of

$5,500. The Wisconsin Supreme Court affirmed, observing that:

> So long as the recovery does not exceed the limits of the insurance, the question of whether the claim be compromised or settled, or the manner in which it shall be defended, is a matter of no concern to the insured. However, when an injury occurs for which a recovery may be had in a sum exceeding the amount of the insurance, the interest of the insured becomes one of concern to him. At this point a duty on the part of the insurer to the insured arises. It arises because the insured has bartered to the insurance company all of the rights possessed by him to enable him to discover the extent of the injury and to protect himself as best he can from the consequences of the injury.

204 Wis. at 14, 235 N.W. at 414. The *Hilker* court noted that those representing the third party claimant were ready to settle the case within the policy limit but the insurer refused, and in so doing failed to exercise reasonable diligence. 204 Wis. at 9, 231 N.W. at 261.

The duty imposed upon insurers in this type of bad faith claim was refined in *Alt v. American Family Mutual Insurance Co.*, 71 Wis.2d 340, 237 N.W.2d 706 (1976). There the injured third party claimant in an automobile negligence case was awarded $329,478.30, and the extent of the insured's policy coverage was only $50,000. The insured's assignees sued the defendant insurance company, alleging that defendant failed to exercise good faith in settlement with the third party claimant. The trial court granted defendant's motion for summary judgment on the rationale that the record did not establish that the third party claimant clearly communicated to defendant a settlement offer within the policy coverage. The Wisconsin Supreme Court reversed and remanded the case. Although the parties disputed whether an offer had been fully communicated to the insurer, the court held that bad faith could be predicated simply upon the opportunity to settle within the policy limits. 71 Wis.2d at 348, 237 N.W.2d at 712. Defendant's denials of receiving an offer could not preclude liability because:

> [A]n insurance company in which is vested the exclusive control of the management of a case, breaches its duty when it has the opportunity to settle an excess liability case within policy limits and it fails to do so. Only if the overtures towards settlement appear, as were said in *Baker v. Northwestern National Casualty Co.* (1965), 26 Wis.2d 306, 313, 132 N.W.2d 493 (*Baker II*) to be "jocular or frivolous," may an insurance company ignore them, and even then it does so at its peril.

71 Wis.2d at 348, 237 N.W.2d at 712. The *Alt* court reiterated the standard of conduct imposed upon the insurer in *Hilker*, viz., plaintiff can establish bad faith if the defendant failed to exercise ordinary care, the *Alt* court adding that the breach of duty must be proved by clear and convincing evidence. 71 Wis.2d at 354, 237 N.W.2d at 715.

Plaintiff recognizes that *Hilker*, *Alt*, and other cases falling under the first category of bad faith insurance claims involve excess judgments against the insured and the insured's claim for reimbursement from the insurer. But plaintiff seeks to bring its action within this type of claim by contending that these decisions contemplate much more than recovery for excess judgment. Plaintiff's contention is unpersuasive. The above-quoted language in *Hilker* is unambiguous wherein the court stated, "So long as the recovery does not exceed the limits of the insurance, the question of whether the claim be compromised or settled, or the manner in which it shall be defended, is a matter of no concern to the insured." *Hilker v. Western Automobile Insurance Co.*, 204 Wis. at 14, 235 N.W. at 414. In addition, except for worker's compensation claims, Wisconsin's third category of bad faith claims (discussed *infra*), all Wisconsin reported decisions available to us which address third party claimants and subsequent disputes between the insured and insurer involve the insured's claim for excess judgment. See *Hilker*, *supra*; *Alt*,

*supra; Johnson v. American Family Mutual Ins. Co.,* 93 Wis.2d 633, 287 N.W.2d 729 (1980); *Howard v. State Farm Mutual Auto. L. Ins. Co.,* 70 Wis.2d 985, 236 N.W.2d 643 (1975); *Howard v. State Farm Mutual Automobile Ins. Co.,* 60 Wis.2d 224, 208 N.W.2d 442 (1973); *Nichols v. United States Fidelity & Guaranty Co.,* 37 Wis.2d 238, 155 N.W.2d 104 (1967); *Baker v. Northwestern National Casualty Co.,* 26 Wis.2d 306, 132 N.W.2d 493 (1965) (*Baker II*); *Baker v. Northwestern National Casualty Co.,* 22 Wis.2d 77, 125 N.W.2d 370 (1963) (*Baker I*); *Maroney v. Allstate Ins. Co.,* 12 Wis.2d 197, 107 N.W.2d 261 (1961); *Berk v. Milwaukee Automobile Ins. Co.,* 245 Wis. 597, 15 N.W.2d 834 (1944); *Lanferman v. Maryland Casualty Co.,* 222 Wis. 406, 267 N.W. 300 (1936); *Schwartz v. Norwich Union Indemnity Co.,* 212 Wis. 593, 250 N.W. 446 (1933). For example, the court in *Alt* observed that:

> All prior Wisconsin cases indicate that an insurance company has more than a passive role—that, in some circumstances at least, it has an affirmative duty to seize whatever reasonable opportunity may present itself to protect its insured from excess liability.

*Alt v. American Family Mutual Insurance Co.,* 71 Wis.2d at 350, 237 N.W.2d at 713. In *Baker v. Northwestern National Casualty Co.,* 22 Wis.2d 77, 125 N.W.2d 370 (1963) (*Baker I*), the court held that the insurer bears a duty to keep the insured timely and adequately informed of all settlement offers received from the claimant, the duty arising specifically to protect the insured from recovery in excess of policy limits. The insurer in the instant action succeeded fully in protecting the insured from an excess judgment; therefore no breach of this duty can be asserted, and hence it is unnecessary to decide whether the period of time it took Continental to settle the claim was reasonable or unreasonable under the circumstances.

In *Kranzush v. Badger State Mutual Casualty Co.,* 103 Wis.2d 56, 307 N.W.2d 256 (1981), the Wisconsin Supreme Court further emphasized the relationship between the insured's excess judgment and the insurer's duty. There the court rejected the adoption of a fourth category of bad faith claims. The court ruled that the adversarial relationship between the third party claimant (a tort victim) and the insurer precluded the third party claimant's bad faith action against the insurer for allegedly delaying the settlement process. In reviewing Wisconsin precedent on bad faith insurance claims, the court remarked:

> A settlement within policy limits is, as a practical matter, of no interest to the insured, since the insured has paid his premium and is shielded to the extent of the policy limits. But as the insurer weighs the merits of settlement within policy limits against the risks of litigation (a decision which the insured has relinquished to the insurer), the insured's potential excess liability hangs in the outcome.

103 Wis.2d at 63, 307 N.W.2d at 260. The court concluded that the excess-judgment bad faith doctrine could not form the basis of plaintiff's action, and we conclude similarly that the excess-judgment bad faith doctrine does not form the basis of Huss' action in the present case.

The second category of Wisconsin bad faith insurance claims is also inappropriate as a basis for Huss' proposed cause of action. This second type of claim, which does not involve a third party claimant, is exemplified by *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978). There, a faulty furnace caused damage to plaintiffs' home, which was covered by plaintiffs' home owners policy obtained from defendant. Plaintiffs submitted to defendant their claim of $4,611.77, the total cost of their home repairs, but defendant refused to reimburse plaintiffs. Plaintiffs brought an action based on breach of contract and bad faith tort. Defendant moved to dismiss the bad faith count, the trial court granted the motion, and the Wisconsin Supreme Court reversed. The court held that insureds are entitled to recovery if the absence of a reasonable basis for denying the insureds

the policy benefits is established. 85 Wis.2d at 691, 271 N.W.2d at 376. A reasonable basis would be lacking where the "validity of the claim [is] not even fairly debatable." *Id.*

Huss cites the broad language found in *Anderson* for the proposition that under Wisconsin law Huss may recover for attorneys' fees and related alleged harm on the ground that Continental should have settled the third party claim in 1979. The court in *Anderson* remarked that:

> [I]n every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is imminent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.

85 Wis.2d at 689, 271 N.W.2d at 375 (quoting *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973)).

■■■ We agree with the general notion mentioned in *Anderson* and other Wisconsin decisions that an insurance contract carries with it an implied covenant of good faith and fair dealing. See generally Gilardy, *Good Faith and Fair Dealing in Insurance Contracts: Gruenberg v. Aetna Insurance Co.*, 25 Hastings L.J. 699, 702 (1974). Yet courts in general and Wisconsin courts in particular recognize only specific, cognizable causes of action implicating this implied covenant, and we are not in a position to expand the list of cognizable actions. In *Anderson* the implied covenant or duty was applied in a situation qualitatively different from the situation before us. *Anderson* involved a direct conflict between the insurer and insured, the insurer intentionally denying to reimburse the insured for the amount of the loss. In contrast, in the instant case the direct conflict was between the insurer and the third

party claimant in an adversarial setting. In the third party context the insured has transferred to the insurer the right and obligation to settle and defend any claim against the insured. Continental did not ignore any demand by Huss to pay Huss; moreover, on the somewhat limited record before us, Continental did not ignore any demand of Huss to pay the third party claimant. Even if Huss had made such a demand, it is Continental that possesses the contractual authority to settle the claim, and it acts at its own peril if it ignores the opportunity to settle within the policy limit and exposes the insured to an excess judgment.

This difference in the role of the insurer in third party actions reflects the distinctly different character of the dispute in the instant case vis-a-vis that in *Anderson* and other first party cases. *Anderson* involved a claim by the insured under a home owners insurance policy which provided coverage for loss occasioned by fire, lightning, explosion, or smoke. Under such a first party insurance contract, the insurer's obligation to pay is conditioned solely upon the happening of the insured event. See generally Kircher, *Insurer's Mistaken Judgment—A New Tort?*, 59 Marq.L.Rev. 775 (1976). The insurer in a first party contract makes no promise to provide a defense to the insured since the claim is made by the insured itself. As the court observed in *Anderson*, the insured had submitted a verifiable request for reimbursement for actual loss; therefore the validity of the claim was not even debatable. But under a third party insurance contract, the insurer's obligation to pay the third party claimant is conditioned upon a finding of liability on the part of the insured, a finding which in this case was never reached by virtue of the pre-trial settlement. Moreover, the proper measure of damages to compensate tort victims such as the injured third party claimant in this case is far less certain and far more debatable[1] than the

---

1. As discussed *infra,* we cannot accept plaintiff's contention that, had the third party claim not been settled, the degree of negligence on the part of plaintiff's driver and the amount of damages to be awarded, which plaintiff pur-

cost incurred by the home owners in *Anderson* in repairing their home. The issues of negligence and the proper measure of damages in the underlying tort claim at issue are difficult and uncertain, and were never tried. Accordingly, the measure of discretion that must be afforded insurers defending disputed claims such as these extends far beyond the limited discretion appropriate in the first party context in *Anderson,* wherein the home owners' property damage claim should have been routinely and mechanically paid by the insurer. These crucial distinctions make *Anderson* and other Wisconsin first party cases an unsuitable basis for Huss' proposed cause of action.

The third situation in which Wisconsin courts have recognized a claim against an insurer for bad faith is in the handling of a worker's claim for benefits under a worker's compensation policy. In *Coleman v. American Universal Insurance Co.,* 86 Wis.2d 615, 273 N.W.2d 220 (1979), an injured worker covered by a policy sued the insurer and its adjusters for bad faith for stopping the compensation payments on three occasions in spite of their knowledge of the validity of the claim. The Wisconsin Supreme Court held that plaintiff stated a proper cause of action against defendants, reasoning that:

> It is boilerplate law in Wisconsin that the rationale underlying statutory worker's compensation is that workers accept smaller recoveries than those potentially available at common law in return for coverage of all work-related injuries regardless of fault.

86 Wis.2d at 621, 273 N.W.2d at 222. Therefore expanding the scope of the bad faith doctrine in favor of injured workers was appropriate in *Coleman* in light of the worker's forfeiture of his cause of action in state court, and in light of the non-debatability of the worker's right to compensation. In *Kranzush v. Badger State Mutual Casualty Co.,* discussed *supra,* as in the present case, the injury to the third party claimant is not covered by the exclusive

worker's compensation remedy. The court in *Kranzush* noted this distinction, stating that:

> [A] third party claimant tort victim * * * is not the object of a sweeping statutory scheme designed to promote the compensation of injuries in a routine, largely nonadversarial manner. It is still the obligation of the tort victim to establish the fault of the tortfeasor, and it is still the prerogative of the alleged tortfeasor to defend himself in court.

*Kranzush v. Badger State Mutual Casualty Co.,* 103 Wis.2d at 65, 307 N.W.2d at 261. Thus the bad faith claim recognized in *Coleman* and reaffirmed in the court's discussion in *Kranzush* is a specific response to a Wisconsin statutory scheme limiting a worker's remedy for injury. In this case Huss cannot raise any analogous statutory scheme as a basis for a bad faith claim against the insurer, and therefore the third category of recognized bad faith claims in Wisconsin is also inapposite.

 Plaintiff argues that even if its bad faith claim does not fall under any of the three types of claims recognized in Wisconsin, this court should accept plaintiff's proposed claim as a fourth. Plaintiff, however, overlooks the limited discretion of a federal appellate court in a diversity case with respect to untested legal theories brought under the rubric of state law. See *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), *Hartzler v. Chesapeake & Ohio Railway Co.,* 433 F.2d 104, 107 (7th Cir.1970). Notwithstanding our limited discretion, plaintiff urges that a Wisconsin court presented with the issue would accept plaintiff's proposed bad faith action. Even assuming we are free so to speculate, it is doubtful that plaintiff's argument would be accepted by a Wisconsin court. It is irrefutable that under Wisconsin law plaintiff's bad faith claim lacks that element upon which Wisconsin bad faith claims involving third parties (not covered by worker's compensation) are predicated—the insured's liability for an excess judgment. Plaintiff, who

ports would be far in excess of the policy coverage, are clear and not issues of fact.

employed the driver who allegedly committed the negligent act, causing injury to the tort victim, paid nothing to the victim. Plaintiff's insurer Continental agreed to pay the claimant $1.1 million, the cost of the settlement falling squarely on Continental. Huss' flat denial at oral argument that Continental's ability to settle the claim within the policy limit amounts to Huss' good fortune is wholly disingenuous. Further, plaintiff did not reject defendant's argument on brief that the settlement for the total policy limit does not increase the insurance premiums payable by Huss since both of Continental's policies issued to Huss were guaranteed rate policies.

The essence of plaintiff's contention is that in a case such as this one, there is a point in time at which liability is clear and obvious, and that it is also clear and obvious that the amount of liability will be far in excess of the policy limit. Plaintiff asserts that in this case that point in time was July 31, 1979, 21½ months before defendant actually settled. According to plaintiff, at this point in time the insurer must settle with the claimant, and the settlement must be in the amount of the policy limit. Failure to do so in plaintiff's view evidences bad faith.

Even assuming that claimants generally would agree to settle for the amount of the policies, plaintiff's proposed rule is highly mechanical, obtrusive, and unrealistic. Plaintiff overstates the ease with which one identifies those third party claims which will result in "clear" and "obvious" liability far in excess of a policy limit. Any experienced personal injury litigator can attest to the myriad of factual issues and uncertainties which greatly affect the damage award in even undisputed liability cases. Moreover, no Wisconsin court has ever imposed a duty upon an insurer to settle a claim for a particular amount. Such a duty would be plainly incongruous with the insurer's contractual right to investigate the claim and defend the claim within its discretion. Additionally, plaintiff's suggestion is absurd in the situation where the insured has purchased negligible protection for the potential risk involved.

For example, in this case if plaintiff's coverage were only $10,000, it is unlikely that any settlement offer by the defendant to the claimant in this amount would be seriously considered, let alone serve as an indication that defendant was acting in good faith.

We reject not only plaintiff's proposed rule but also its purported application in this case. Given that in this case the claimant did settle for the $1.1 million policy limit, we question the alleged certainty with which claimant would have obtained a judgment far in excess of the policy limit, even if the trial costs claimant undoubtedly sought to avert are factored into the calculus. Memoranda between Continental's counsel and Huss based on depositions indicate that the degree of negligence committed by Huss' driver and William Mangin's driver (his sister Patricia) was a disputable issue. At the intersection where impact occurred, only the Mangin automobile was obligated to stop at the stop sign. Claimant's sister apparently did so but proceeded into the intersection while Huss' truck was approaching the intersection. At that point David Mangin, another passenger in the automobile, exclaimed, "there's a truck coming." Patricia Mangin admitted she saw the truck while proceeding through the intersection but explained that she thought she could make it through the intersection without collision. Balanced against this evidence is the indication that Huss' driver exceeded the 35 mile-per-hour speed limit prior to impact. The engineer retained by Mangin believed that the truck was exceeding 50 miles per hour prior to impact (Ex. O), while Continental's expert estimated the speed to be 43 to 49 miles per hour, with impact at 35 to 40 miles per hour (Ex. P). Huss' driver maintained that his speed was 25 to 30 miles per hour prior to and at impact. As described by Continental's counsel in a letter to Huss, the truck driver's testimony, if believed by a finder of fact, would jeopardize the prospect of substantial recovery by Mangin against Huss and Continental:

Mr. Moldenhauer [Huss' driver] stated there was a traffic sign stating "school zone—15 m.p.h.—when children are present" within one mile south of the intersection. There is a school adjacent to the accident intersection. He stated that he had a clear view of the school-grounds before reaching the intersection and that he saw no children present. Accordingly, he maintained his speed at 25 to 30 m.p.h. right up until the time of impact. Mr. Moldenhauer believes the crest of the hill to the south of the intersection is some 200 to 300 yards away from the intersection. He first saw the Mangin car when he reached this crest; at that time the car was approaching the intersection from the east. After first seeing the car he kept his eyes fixed on it until it stopped at the stop sign. When the car was stopped at the stop sign his truck was 75 yards to the south of the intersection. He then looked away from the car to the west to observe any traffic which might be approaching the intersection from that direction. When he was 20 to 25 yards south of the intersection he looked back to the car and saw it had a woman driver. Craig [Moldenhauer] is adamant that Patricia Mangin looked him directly in the eye at this time; her car was still stopped at the stop sign. He turned away from the Mangin car but two seconds later the car pulled directly in front of him; at this time he was ten to fifteen feet away from the intersection. He reacted by turning his steering wheel to the left and applying his brakes. He estimates his foot reached the brake pedal just at the time of impact. His truck struck the Mangin car broadside with the impact focused on the rear driver's door (behind which was William). Although his truck rolled over after the impact, he was not injured. After escaping from the truck he went to the Mangin car and saw Patricia running around outside the car repeating "I'm sorry, I'm sorry."

(Letter of July 23, 1979, Ex. Q, p. 1). Under Wisconsin comparative negligence law, the damages that Mangin's attorney would have established at trial and recovered from Huss and Continental would have been reduced by whatever percentage of negligence was attributable to Patricia Mangin. See Wis.Stat. § 895.045 (1983). Plaintiff's contention is further impugned given that the claimant in November 1977 offered to settle the claim with defendant for only $100,000.[2]

A primary element of plaintiff's alleged damages—the $13,207.01 for plaintiff's attorneys' fees in "monitoring the activities of Continental in defending the claim against Huss" (Plaintiff's Br., p. 9)—is also suspect if one accepts the alleged certainty of claimant's claim. The need, if any, to monitor the insurer would seem greater in the situation where the insured's potential excess liability is highly uncertain, the insured possibly in a position to assist the insurer in convincing the claimant that a modest settlement should be accepted by urging that the probability of a small judgment is greater than the probability of a multi-million dollar judgment. Yet in this case, if as plaintiff alleges, the claim after July 31, 1979, was no longer debatable, the insured's devoting dozens if not hundreds of attorney hours to the matter would be of dubious value. Moreover, the insurer in this case if anything exceeded its obligation to defend the insured zealously and succeeded in avoiding any liability accruing to the insured. Intuitively, the third party claimant would have a more compelling argument for a bad faith action against defendant than would plaintiff, since under the alleged facts the insurer stubbornly resisted and interfered with claimant's efforts to recover for the clear loss. The Wisconsin Supreme Court in *Kranzush, supra,* precludes this avenue outside the context of worker's compensation claims; thus *a fortiori* plaintiff's proposed cause of action is untenable.

---

**2.** This offer was made before it was known that plaintiff was covered by a $1 million umbrella liability policy.

Plaintiff suggested at oral argument that William Mangin, had defendant not offered the $1.1 million settlement, might have received a $5 million award at trial. If this had in fact happened and defendant had ignored the opportunity to settle for $1.1 million or less within the meaning of *Hilker* and *Alt, supra,* under Wisconsin law defendant would be liable to plaintiff for the excess judgment of $3.9 million. But plaintiff was exposed to no excess judgment under the facts of this case. Plaintiff's claim of attorneys' fees incurred by virtue of "monitoring" defendant (and the claim for fees in prosecuting this action) would be more compelling—though we need not decide this particular issue—if defendant had failed to settle the claim within the policy limit.

What plaintiff's contention implicitly overlooks is that all litigation, including third party insurance litigation, results in some detriment to those involved. The most distressing loss is to the claimant himself, since no matter what the settlement, monetary damages in human terms simply do not make the badly injured whole. The defendant insurer loses insofar as it accepted by contract a calculated risk in insuring plaintiff, and the actual risk and resulting $1.1 million settlement no doubt exceeded the most probable extent of risk calculated *ex ante* by defendant. Defendant also devoted substantial time and effort in settling the claim, for which plaintiff bears no obligation to reimburse under the insurance contracts. Finally, plaintiff shifted to the extent of $1.1 million the risk of accident liability, but this is the extent to which the parties' insurance contracts shift risk from plaintiff to defendant. The parties did not contract to shift plaintiff's risk in regard to detriment to plaintiff's credit rating stemming from accident litigation, any attendant loss of corporate goodwill, or plaintiff's attorneys' fees resulting from any monitoring of defendant's settlement efforts. Plaintiff could have negotiated with defendant for reimbursement of attorneys' fees or other provable damages arising from third party suits. As stated in

*Bean v. Kovacik,* 10 Wis.2d 646, 103 N.W.2d 899 (1960):

> The right to contract is a fundamental right and parties to an insurance contract have a legal right to insert such provisions in the agreement as they see proper so long as the contract does not contravene the law or public policy.

10 Wis.2d at 650, 103 N.W.2d at 901 (regarding clause limiting insurer's liability).

■ Moreover, plaintiff inappropriately implies that defendant in its correspondence with plaintiff compelled plaintiff to obtain counsel. Defendant simply advised plaintiff in standard language that plaintiff had the option of retaining counsel in connection with the case and that if so, defendant would cooperate with plaintiff's counsel.

Plaintiff cites several cases from other jurisdictions to support its claim for attorneys' fees allegedly incurred in monitoring Continental's settlement efforts and for fees incurred in prosecuting this action. While a Wisconsin court presented with the instant case might indeed look to the law of other jurisdictions in deciding the case, this Court is without meaningful guidance as to how and to what extent, if any, a Wisconsin court would do so. Moreover, the decisions proffered by plaintiff lend meager support to plaintiff's position. For example, *State Farm Mutual Automobile Insurance Co. v. Brewer,* 406 F.2d 610 (9th Cir.1968) (applying Oregon law); *Canadian Universal Insurance Co. v. Employers Surplus Lines Insurance Co.,* 325 So.2d 29 (Fla.App.1976); *Reichert v. Continental Insurance Co.,* 290 So.2d 730 (La.App. 1974), and other cases cited by plaintiff involve an insured seeking redress for the insurer's unreasonable failure to settle, resulting in a substantial excess judgment. Where an excess judgment was established, those courts allowed the insured to recover attorneys' fees, but only in conjunction with the prosecution of the subsequent action in connection with the excess judgment. These decisions do not address attorneys' fees claims regarding any prior monitoring of the insurer during settle-

ment. See *Brewer, supra* (applying Oregon attorneys' fees statute); *Canadian Universal Insurance Co., supra* (suit brought by excess insurer against primary insurer); *Reichert, supra* (where excess judgment, attorneys' fees awarded for the subsequent insured-insurer action as well as for the insured's costs in appealing the prior judgment in favor of the third party claimant; no claim for "monitoring" fees was asserted). Our research discloses other state developments, again none of them controlling in this case. For example, in California an insured may recover attorneys' fees where the insurer disavowed any duty to defend the insured against a third party claimant, requiring the insured to conduct the defense. See *Lowell v. Maryland Casualty Co.*, 65 Cal.2d 298, 301–302, 54 Cal.Rptr. 116, 419 P.2d 180 (1966); *Patterson v. Insurance Co. of North America*, 6 Cal.App.3d 310, 317–318, 85 Cal.Rptr. 665 (1970); *Carroll v. Hanover Insurance Co.*, 266 Cal.App.2d 47, 50, 71 Cal.Rptr. 868 (1968). In contrast to the cases cited by plaintiff, under this development attorneys' fees are recoverable for the cost of defending the underlying third party claim, but these courts expressly denied the award of fees for the prosecution of the subsequent action to recover the fees incurred in the prior action. And in *Twentieth Century-Fox Film Corp. v. Harbor Insurance Co.*, 85 Cal.App.3d 105, 113–115 and n. 11, 149 Cal.Rptr. 313 (1978), a California appellate court extended the recovery of attorneys' fees to the situation where the insurer agrees to defend the insured against the third party claimant, but unreasonably fails to accept an offer within the policy coverage, resulting in an excess judgment against the insured. There the court held that the insurer must reimburse the insured for the excess judgment exceeding $500,000, plus $2,780 in attorneys' fees incurred by the insured regarding a compromise judgment in connection with the first action, but no reimbursement was allowed for the insured's attorneys' fees in bringing the subsequent action against the insurer.

It is readily apparent therefore that there exist numerous and disparate state law developments regarding attorneys' fees in insurance bad faith actions, and that none of them are squarely applicable to this case. Continental did not expose Huss to an excess judgment, nor did Continental disavow its contractual obligation to settle. This Court therefore cannot sift through other state law to furnish plaintiff's theory with an anchorage, especially since, as discussed *supra*, Wisconsin case law is inhospitable to plaintiff's proposed cause of action.

Accordingly, the judgment of the district court is affirmed.